**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 2 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

GREATER YELLOWSTONE COALITION
and JACKSON HOLE CONSERVATION
ALLIANCE,

      Plaintiffs - Appellants,

SNAKE RIVER FUND,

      Plaintiff - Intervenor,

  v.

ROBERT B. FLOWERS, Commander and
Chief of Engineers, United States Army
Corps of Engineers, in his official capacity;
KURT F. UBBELOHDE, District Engineer
of Omaha District, United States Army
Corps of Engineers, in his official capacity;
CANYON CLUB, INC., a Wyoming
corporation,

      Defendants - Appellees.

No. 03-8034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 02-CV-1036-D)**

---

Timothy J. Preso (Douglas L. Honnold with him on the briefs), Earthjustice,
Bozeman, Montana, for Plaintiffs - Appellants.

Aaron P. Avila, United States Department of Justice, Environment and Natural
Resources Division, Washington, D.C. (Thomas L. Sansonetti, Assistant Attorney
General, Washington, D.C.; Matthew H. Mead, United States Attorney, Cheyenne,

Wyoming; Carol A. Statkus, Assistant United States Attorney, Cheyenne, Wyoming; Jon M. Lipshultz and Ellen J. Durkee, Attorneys, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; and Gary M. Henningsen and Stanley E. Tracey, Of Counsel, United States Army Corps of Engineers, Omaha, Nebraska, with him on the brief), for Defendants - Appellees Robert B. Flowers and Kurt F. Ubbelohde.

Marc R. Stimpert (Franklin J. Falen and Richard W. Walden with him on the brief), Budd-Falen Law Offices, P.C., Cheyenne, Wyoming, for Defendant - Appellee Canyon Club, Inc.

---

Before **EBEL**, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

In this case we consider Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70f, challenges to a CWA § 404 "dredge and fill" permit, issued by the U.S. Army Corps of Engineers ("Corps") to Canyon Club, Inc. ("Canyon Club"), a development company. The permit authorizes Canyon Club to proceed with constructing an upscale housing development and championship golf course on ranch land previously owned by Mr. L. Richard Edgcomb, Canyon Club's president and primary shareholder. The land lies along the Snake River in Teton County, Wyoming, in the vicinity of highly productive bald eagle nesting territory.

Two environmental groups, the Greater Yellowstone Coalition and the Jackson Hole Conservation Alliance (collectively referred to as the appellants), brought this suit against Corps officials (collectively referred to as the federal appellees) and Canyon Club, challenging the Corps' issuance of the permit as a final agency action and seeking a preliminary injunction on construction activities.[1] The district court denied the appellants' motion for a preliminary injunction. In an interlocutory appeal from that decision, this court reversed and remanded the case for further consideration. Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250 (10th Cir. 2003) ("Greater Yellowstone I"). Shortly thereafter, the district court decided the case on the merits, upholding the Corps' issuance of the permit.

In this appeal, the appellants ask us to set aside the permit because, they argue, (1) the Corps' consideration of alternatives to Canyon Club's proposal did not meet the requirements of either the CWA or NEPA, and (2) the Corps also violated NEPA by failing to prepare a full environmental impact statement.

---

[1]The Snake River Fund is listed as a plaintiff-intervenor but has not filed a brief in this proceeding.

# BACKGROUND

The 359-acre Canyon Club development property lies seventeen miles south of Jackson, Wyoming, in the Snake River Canyon, across the river from U.S. Highway 26/89. The property is part of a "1,222-acre conglomerate of private land" that includes a 544-acre segment of the River Bend Ranch on the Canyon Club property's north side, the 195-acre Snake River Canyon Ranch to the north of that, and a 125-acre segment of the River Bend Ranch to the south, on the other side of a strip of National Forest land. Appellants' App. Vol. 3 at 419. Together, these properties "represent the largest private land-development opportunity in the upper portion of the Snake River Canyon." Id.

While upstream levees have negatively impacted the Snake River's riparian habitat closer to Jackson, the area surrounding the Canyon Club property "currently supports an intact and healthy riparian ecosystem" that includes important wintering, foraging, and nesting habitat for bald eagles. Id. Vol. 1 at 35. Three bald eagle nesting territories lie on or in the immediate vicinity of the Canyon Club property. Two of these – the Dog Creek and the Cabin Creek territories – have been highly productive, together yielding at least fifty-six fledglings since the bald eagle's 1978 listing as "endangered" under the

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44.[2] The pair occupying the third territory – Martin Creek – have produced fledglings only once since constructing their nest in 1995. The area's habitat also supports moose, elk, mule deer, black bears, mountain lions, trumpeter swans, and Snake River cutthroat trout, among other species.

As noted above, the Canyon Club property was originally part of the River Bend Ranch, which Mr. and Mrs. Edgcomb purchased in 1994 and operated as a cattle ranch. Responding to the impact of tourism on the Teton County economy, the Edgcombs sold 286 acres of the Ranch to Canyon Club in December 2000, intending the land to be converted into an eighteen-hole golf course and residential development. According to Canyon Club, the Edgcombs needed the income generated by such a development in order to sustain the operation of the Ranch.

At that time, the project design included fifty-four homes and placed golf course holes three and four on a gravel peninsula extending into the Snake River. Construction would require dredge and fill activities in waters and wetlands under

---

[2]After significant recovery, the bald eagle's status was upgraded to "threatened" in 1995, 60 Fed. Reg. 36000, and was proposed for delisting in 1999, 64 Fed. Reg. 36454. As of this date, the proposal has been neither adopted nor withdrawn. According to the U.S. Fish and Wildlife Service ("FWS"), the bald eagle is listed as a Native Species Status 2 by the Wyoming Game and Fish Department "due to on-going significant habitat loss within the State." Appellants' App. Vol. 1 at 35.

the Corps' jurisdiction, thus triggering the need for a § 404 permit.[3]  Canyon Club

therefore submitted a § 404 permit application to the Corps in March 2001,

requesting authorization to fill 1.5 acres and dredge 2.75 acres of jurisdictional

wetlands, and to place up to twenty-three bendway weirs in the Snake River as

necessary to stabilize the bank and prevent erosion.  The Corps issued public

notices of the proposal on April 19 and July 24, 2001.

The 286-acre proposal met with opposition from the public and various

state and federal agencies, including FWS, primarily due to the development's

potential effects on bald eagles and the possible impact of the bendway weirs on

the Snake River.  The proposal also did not comply with newly-developed Teton

County land development regulations (LDRs) for golf courses, which prohibit

golf course features within 150 feet of the river.  In response to this opposition,

Canyon Club met with various environmental groups and government agencies to

discuss modifications to the proposal.  At the Corps' suggestion, Canyon Club

considered relocating holes three and four elsewhere within the 286 acres.

However, it was determined that this change would actually increase the project's

adverse environmental impact and would still involve golf course feature

construction within LDR-mandated setbacks.

---

[3]The Supreme Court established the extent of the Corps' jurisdiction over wetlands in Solid Waste Agency v. U.S. Army Corps of Eng'rs, 531 U.S. 159 (2001).

FWS then suggested that Canyon Club consider extending the project north onto property that was then an alfalfa field and still part of the River Bend Ranch. In response, Canyon Club purchased the additional property from the Edgcombs, expanding the project area to 359 acres, and redesigned its proposal. At the Corps' suggestion, Canyon Club withdrew its original § 404 application and submitted a new application, based on the new design, in October 2001.

Like the original proposal, the 359-acre proposal involves construction of an eighteen-hole golf course, including a clubhouse and maintenance facilities. The number of housing units was increased to sixty-six residences on 4000-foot lots, primarily in the southeast part of the project site, and five rental cabins next to the golf course.[4] The construction would involve filling 1.45 acres and dredging 1.71 acres of jurisdictional wetlands.[5] In addition, .31 acre of Snake River would be filled during construction of up to twelve bendway weirs, .05 acre of tributaries would be filled during golf course construction, and 2.12 acres of an existing pond would be dredged during its reconstruction.

_____

[4]The proposal indicated that golf course employees would be housed at the neighboring Snake River Canyon Ranch. Although the record is unclear on this point, it appears the Snake River Canyon Ranch is also owned by the Edgcombs or Canyon Club.

[5]Of the 1.45 acres to be filled, .87 acre is for homesite lot development, .06 acre for cart path construction, .43 acre for hole and tee construction, .08 acre for water feature construction, and .01 acre for bendway weir construction. The entire 1.71 acres to be dredged is for water feature construction.

The proposal also describes measures designed to mitigate the project's environmental impact. The reconstructed pond and three new ponds, incorporated in the golf course design as water hazards, would provide habitat for waterfowl and cutthroat trout. Snake River water would be diverted into the Martin Creek stream channel in order to provide trout spawning habitat. Utility lines, including a 3.8-mile-long power line currently traversing the Snake River Canyon Ranch, River Bend Ranch, and Canyon Club properties, would be buried underground, and temporary wetland fill during this process would be removed. New conservation easements would be established on both the River Bend Ranch (a 244-acre easement) and the Canyon Club property (an 88-acre easement along the Snake River setback).[6] The Canyon Club residential development's declaration would include restrictive covenants controlling owner use of the property with regard, for example, to pets, snowmobiles, tree removal, and wildlife feeding.

In the course of its decisionmaking process, the Corps asked Canyon Club to submit three documents – a biological assessment ("BA"), an environmental assessment ("EA"), and a § 404(b)(1) analysis. All three documents were prepared by Pioneer Environmental Services, Inc., an environmental consulting firm.

---

[6]These easements would be in addition to an 85-acre conservation easement on the Snake River Canyon Ranch and a 48-acre conservation easement on the River Bend Ranch that are already in place and protect elk migration corridors.

The BA, submitted October 22, 2001, considered the project's impact on species protected under the ESA, primarily focusing on bald eagles. It concluded that, as a result of construction activities as well as the increased human presence after the golf course and homes were occupied, the development "may affect, and is likely to adversely affect bald eagles," potentially causing the three eagle pairs to abandon their nests. Appellants' App. Vol. 4 at 682.

The Corps then issued a thirty-day scoping notice in connection with the 359-acre proposal on November 21, 2001, soliciting public comments on the project impacts. Attached to the notice were a number of maps showing the location of the houses and detailing the wetland impacts of golf course and lot construction. The notice informed the public that the project "is likely to adversely affect bald eagles" and that the Corps would therefore consult with FWS as required under ESA § 7, 16 U.S.C. § 1536. Appellants' App. Vol. 2 at 257.[7]

In fact, the Corps had initiated formal consultation with FWS on November 16, 2001. After reviewing the Pioneer BA and gathering further information through direct correspondence with Pioneer and Corps staff and from

_____

[7]The notice also indicated that "[a]ny person may request, in writing and within the [thirty-day] comment period," a public hearing "for the purpose of gathering additional information." Id. at 258. No request for a hearing was made, and none was held.

other sources, FWS issued a biological opinion ("BiOp") on April 5, 2002. The BiOp concluded that the Canyon Club development, as proposed, "is not likely to jeopardize the continued existence of the bald eagle" as a species, even if the Dog Creek, Cabin Creek, and Martin Creek eagle pairs were lost. Id. Vol. 4 at 851. Also, no bald eagle critical habitat would be affected since none had been designated.

Attached to the BiOp was FWS's incidental take statement, indicating that FWS "anticipates the loss of 3 bald eagle nesting territories . . . as a result of the proposed action." Id. at 852. Since there appeared to be no unoccupied nesting habitat elsewhere in the area, this would entail the "loss of 6 adult bald eagles." Id. In addition, up to twelve juvenile bald eagles would be lost during the project's two-year construction period as a result of the three pairs' anticipated failure to breed or abandonment of their nests. The incidental take statement allowed the Corps to issue a § 404 permit authorizing the project without violating the ESA, provided that the Corps ensure Canyon Club's compliance with a number of terms and conditions. These included the requirements that construction activities be completed within two years, that construction be regulated so that no activity would take place within 400 meters of a nest containing eagle chicks less than three weeks old, and that the effects of the project on the eagle nests be

closely monitored by qualified biologists, both during construction and for five years after its completion.

In addition to its consultation role under the ESA, FWS also responded directly to the Corps' November 2001 public notice. In a comment letter dated December 20, 2001, the FWS Wyoming field office had recommended that the Corps deny the § 404 permit because of the expected "substantial and unacceptable impacts" on wildlife, including bald eagles, and because "less environmentally damaging alternatives to the proposed project have not been adequately evaluated." Id. Vol. 2 at 292. FWS had also recommended that the Corps prepare an environmental impact statement ("EIS") to evaluate the project's impact and analyze the cumulative effects of the project together with proposed highway reconstruction and increased heli-skiing excursions operating out of the nearby Snake River Canyon Ranch.[8]

In light of these concerns, the FWS regional director, on January 14, 2002, had written to the Corps "reserv[ing] the option of elevating this project to the Washington level for further review" in accord with a 1992 Memorandum of Agreement ("MOA") between the Departments of Interior and the Army regarding

---

[8]Helicopters have picked up skiers from Snake River Canyon Ranch, transported them to ski slopes, and returned them to the Ranch since approximately 1977. Three to eight flights a day generally occur from December to April. Id. Vol. 4 at 668. Flights are projected to increase in frequency due to development of residential housing on Snake River Canyon Ranch.

CWA § 404. Canyon Club's App. at 87. On June 4, 2002, therefore, the Corps notified FWS of its decision to issue the § 404 permit and sent FWS copies of the Pioneer documents and a draft permit. On June 7, 2002, the FWS regional director responded that he had "decided not to request higher level review." Id. at 89.

Thereafter, on June 14, 2002, the Corps issued its decision granting the § 404 permit. The decision document was also designated as constituting the Corps' environmental assessment, statement of findings, public interest review, and NEPA compliance determination, and incorporated the Pioneer § 404(b)(1) analysis, EA, and BA, attaching these as appendices.

The decision document stated its agreement with the Pioneer § 404(b)(1) analysis' conclusion that the proposed action "is the least damaging practicable on-site alternative." Appellants' App. Vol. 2 at 224. The Pioneer § 404(b)(1) analysis had noted that its determination of what was "practicable" took into account limitations imposed by golf course design requirements, Teton County LDRs, and the project's stated purpose, which included the preservation of River Bend Ranch. It then described five alternatives, including a no-action alternative, a nine-hole golf course, the original 286-acre proposal, the suggested modification of the 286-acre proposal by relocating holes three and four, and the current 359-acre proposal. The analysis concluded that the no-action alternative would have a greater environmental impact than the proposed action because it would likely lead

to the sale of the entire River Bend Ranch to Canyon Club and the construction of a 250-house residential development on the property. The analysis determined that the nine-hole golf course alternative was impracticable because the resulting reduced value of the associated residences and the lower demand for such a golf course would not cover golf course operation expenses or provide the required financial support to River Bend Ranch. The 286-acre alternatives were also deemed impracticable because they did not comply with Teton County LDRs. The analysis concluded that the proposed action "is the least damaging practicable alternative that satisfies the project purpose." Id. at 322.

The Corps had also conducted an independent analysis of whether other real estate sites in Teton County were practicable alternative sites for the project. The Corps found only two properties on the market that could support such a project and determined that locating the project at these locations would have a similar impact on wetlands while entailing a much higher cost than the proposed action. The Corps concluded that the proposed action "is the least environmentally damaging practicable alternative available." Id. at 225.

The Pioneer EA initially considered the same range of alternatives described in the § 404(b)(1) analysis but eliminated the nine-hole golf course and the modified 286-acre alternatives from detailed discussion because the former was not economically viable and the latter would have greater environmental impacts

than the original 286-acre proposal. The EA then described the expected impacts of each of the three remaining alternatives (the preferred 359-acre proposal, no action, and the original 286-acre proposal) on soils and geology, water resources, wetlands, vegetation, wildlife, fisheries, cultural resources, land use, recreation, public utilities, socioeconomics, transportation, and visual resources.

In its analysis of wildlife impacts, the EA predicted that the no-action alternative, while significantly reducing wildlife habitat on most of the River Bend Ranch and Canyon Club properties,[9] should theoretically have less impact on bald eagles because its design would attempt to avoid the requirement for an incidental take permit from FWS. In fact, however, the ESA would likely "need to be revisited to determine whether . . . provisions for the incidental take of bald eagles would be necessary," with the result that the same issues would be "re-analyz[ed] . . . in the near future." Id. Vol. 3 at 390. The 286-acre alternative was expected to have a lesser impact on the Dog Creek nest because golf course features would be farther away, but the two golf course holes on the gravel peninsula would negatively impact eagle foraging habitat. The EA concluded that, "[g]iven the inherent right of land owners to develop their properties consistent with county

_____

[9]The assessment noted that the anticipated development of residential housing on the River Bend Ranch might disrupt migration routes and winter range habitat for elk, moose, mule deer, and perhaps trumpeter swans.

-14-

development regulations," the "transition of land use from agricultural/ranching activities to residential and resort development" was "unavoidable." Id. at 474.

The Corps' decision document summarized the Pioneer EA and BA's impact analyses, concluding that all practicable alternatives would have similar impacts on wetlands and fish and wildlife. The Corps supplemented the Pioneer reports with further discussion of the project's potential effects on Snake River recreational users. It acknowledged that the loss of the Cabin Creek eagle pair would interfere with the U.S. Forest Service's goal of maintaining four bald eagle pairs on National Forest land in that vicinity. This, in turn, could lead the Forest Service to reduce the level of recreational river use in order to compensate for increased human activity on Canyon Club property. The Corps concluded, however, that the potential for such an impact and the associated loss in public and private revenues was "extremely remote" and was insufficient to warrant denial of the permit. Id. Vol. 2 at 231.

In response to public comments concerning the impact of the proposed bendway weirs on the Snake River, the Corps noted that if the weirs were implemented, the Corps would monitor their effect on the river and could require their modification or removal if the effect was adverse. The Corps thus concluded that the bendway weirs were "not likely to adversely affect the proper function of the Snake River and associated floodplain." Id. at 233.

In discussing the project's proposed mitigation activities, the Corps concluded that the establishment of the planned conservation easements would fully mitigate any adverse effects of the project on riparian areas adjacent to the Snake River. In addition, the Corps noted that wetland areas excavated during construction of the four ponds involved in the project would likely rejuvenate in shallow areas of the ponds, that the project would enhance fish habitat in Martin Creek, and that some wetlands in the project area had already been severely degraded by livestock grazing. The Corps did, however, require compensatory wetland creation at a ratio of at least 1.5:1 for various wetland types.

The Corps then issued its determination that the project would not have a significant impact on the quality of the human environment and that an EIS was therefore not required. In granting the § 404 permit, the Corps established certain mandatory conditions and, in particular, noted that the permit authorization was conditional upon Canyon Club's compliance with the terms and conditions imposed by FWS's incidental take statement.

The appellants then brought suit in federal district court challenging the § 404 permit decision as a final agency action and seeking a temporary restraining order ("TRO") and preliminary injunction to halt construction on the project. Although the district court initially granted the TRO, it lifted the order on August 16, 2002, following a hearing. On August 19, 2002, it denied the

-16-

preliminary injunction, holding that the appellants had failed to show irreparable harm to bald eagles if the injunction were not issued. We reversed this holding on appeal on February 20, 2003, and remanded the case, directing the district court to consider the other prongs of the preliminary injunction test. Greater Yellowstone I, 321 F.3d at 1261-62.

Canyon Club requested en banc review of this court's decision. However, on April 25, 2003, before this court had ruled on the en banc petition, the district court issued a final judgment on the merits, rejecting the appellants' environmental law claims and affirming the Corps' issuance of the § 404 permit. In doing so, the district court denied the appellants' request to supplement the administrative record with an affidavit by Mr. Stephen Speidel, a landscape architect, describing alternative golf course layouts that, the appellants claimed, served the project's purpose while inflicting less harm on bald eagles than the design approved by the Corps.

The appellants raise some of the same issues here that they raised below under the CWA and NEPA and also challenge the district court's refusal to admit the Speidel affidavit. We denied the appellants' motion for an injunction pending appeal on May 22, 2003. We now consider the merits of the appellants' claims.

**DISCUSSION**

We review the Corps' compliance with NEPA and the CWA pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-06, which "empowers a reviewing court to hold unlawful and set aside [final] agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002), modified on reh'g, 319 F.3d 1207 (10th Cir. 2003). In considering whether to overturn the Corps' decision to issue the § 404 permit, we apply the same deferential standard to the administrative record as did the district court; the Corps' determinations "may be set aside only for substantial procedural or substantive reasons." Id.

We address the appellants' CWA and NEPA claims in turn below.

**1. Consideration of Alternatives Under the Clean Water Act**

CWA § 404, 33 U.S.C. § 1344, prohibits dredging or filling waters of the United States, including wetlands, without a permit from the Corps authorizing the dredge or fill activity. 33 U.S.C. § 1344(a), (d).[10] The Corps may not issue a

_____

[10]This restriction applies where the dredge or fill is "incidental to any activity having as its purpose bringing an area of [jurisdictional] waters into a use to which it was not previously subject." Id. § 1344(f)(2). Thus, "normal farming, silviculture, and ranching activities," as well as certain maintenance activities, are

(continued...)

-18-

§ 404(b)(1)[11] permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem," unless the alternative has "other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). A "practicable" alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Id. § 230.10(a)(2).

The Corps' burden in finding the least damaging practicable alternative under the CWA guidelines is heaviest for non-water dependent projects planned for a "special aquatic site," such as a wetlands area. See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1524 (10th Cir. 1992). There, the presumption is that there are "practicable alternatives that do not involve special aquatic sites" and that these alternatives do "have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a)(3). These presumptions hold unless "clearly demonstrated otherwise." Id. We have thus held that in such a case, the Corps may not issue a § 404 permit unless the applicant, "with independent verification by the [Corps],

_____

[10](...continued)
excluded from the permit requirement. Id. § 1344(f)(1).

[11]Section 404(b)(1) directs that most permits be issued in compliance with guidelines ("CWA guidelines") developed by the Environmental Protection Agency, in conjunction with the Corps. 33 U.S.C. § 1344(b)(1). These guidelines are published in 40 C.F.R. Part 230. The Corps' own regulations governing issuance of permits direct that § 404(b)(1) permits be issued in accord with these guidelines. 33 C.F.R. §§ 320.2(f), .4(b)(4).

. . . provide[s] detailed, clear and convincing information *proving*" that an alternative with less adverse impact is "impracticable." Utahns for Better Transp., 305 F.3d at 1186-87 (requiring denial of a permit "where insufficient information is provided to determine compliance"); see also Greater Yellowstone I, 321 F.3d at 1262 n.12 ("[U]nder the CWA, it is not sufficient for the Corps to consider a range of alternatives to the proposed project: the Corps must rebut the presumption that there are practicable alternatives with less adverse environmental impact.").

Citing Utahns for Better Transportation, the appellants argue that the Corps violated 40 C.F.R. § 230.10 by "fail[ing] to require 'detailed, clear and convincing information' proving that there was no practicable alternative to the Canyon Club developer's proposal" and "ignor[ing] obvious alternatives with fewer adverse impacts on the 'aquatic ecosystem.'" Appellants' Br. at 27. Specifically, the appellants contend that the Corps failed to consider whether the Canyon Club property could be expanded so that certain features of the golf course and housing development could be relocated to the north, on what until now has remained part of the River Bend Ranch, "so as to avoid dredging and filling jurisdictional wetlands, constructing weirs in the Snake River, and related impacts to bald eagles." Id. at 28. The appellants also suggest the Corps should have considered

whether wetland and bald eagle impacts could have been reduced by decreasing the number of home sites in the planned housing development.[12]

The appellees respond that the Corps need not have considered these alternatives because, first, they do not serve the project's purpose of preserving the River Bend Ranch as an operating ranch, and second, the Corps' analysis reflects an adequate level of effort and documentation in light of the proposal's expected impact. We uphold the Corps' § 404(b)(1) alternatives analysis on the latter basis.

We first recognize that the Corps, in determining whether to issue a § 404 permit, "'has a duty to take into account the objectives of the applicant's project,'" Sylvester v. U.S. Army Corps of Eng'rs, 882 F.2d 407, 409 (9th Cir. 1989) (quoting La. Wildlife Fed'n, Inc. v. York, 761 F.2d 1044, 1048 (5th Cir. 1985) (per curiam)), as long as this objective is "'legitimate,'" id. (quoting Friends of the Earth v. Hintz, 800 F.2d 822, 833 (9th Cir. 1986)). See Nat'l Wildlife Fed'n v. Whistler, 27 F.3d 1341, 1346 (8th Cir. 1994) (noting the Corps should not permit developers to "artificially constrain the Corps' alternatives analysis by defining the projects' purpose in an overly narrow manner"). However, the burden of proving

_____

[12]In light of the applicant's burden under the CWA, we accept for purposes of this discussion the appellants' contention that these alternatives are sufficiently obvious that they need not have been suggested to Canyon Club or the Corps prior to issuance of the § 404 permit to be considered here. We address the admissibility of the Speidel affidavit below in our discussion of the Corps' compliance with NEPA.

that a given alternative does not meet the applicant's objective remains on the applicant when 40 C.F.R. § 230.10(a)(3) applies, and the applicant's assessment must be critically evaluated by the Corps. See Friends of the Earth, 800 F.2d at 835-36 (recognizing the Corps must rely on information provided by the applicant but must not do so "uncritically"); La. Wildlife Fed'n, 761 F.2d at 1048 (noting the applicant's burden); Korteweg v. Corps of Eng'rs of the U.S. Army, 650 F. Supp. 603, 604 (D. Conn. 1986) (same); Hough v. Marsh, 557 F. Supp. 74, 83-84 (D. Mass. 1982), aff'd, 725 F.2d 677 (4th Cir. 1984) (remanding the Corps' issuance of a permit where the Corps failed to hold applicants to their burden); Shoreline Assocs. v. Marsh, 555 F. Supp. 169, 179 (D. Md. 1983) (upholding the Corps' denial of a permit where the applicant "failed to show . . . why it is necessary for the [development] to be located on the wetlands rather than the uplands, except for its preference to build on the wetlands").

Here, it is true that one of Canyon Club's stated purposes in developing the golf course and housing complex was to "[s]upplement ranching operations on the adjacent River Bend Ranch with income from the Canyon Club in order to continue the working ranch operations." Appellants' App. Vol. 2 at 220. The Pioneer § 404(b)(1) analysis, adopted by the Corps, proceeded to explain that:

> [t]he total amount of acreage available for development by the Canyon Club Development is limited by ownership and availability. Any additional commitment of land to the development would have to be made available by the River Bend Ranch. Any action that reduces

-22-

the size of the River Bend Ranch to the status of a non-viable ranch operation would trigger the full allowable build-out of all remaining undeveloped property for both the River Bend Ranch and the Canyon Club properties. . . . Therefore, one of the factors for meeting the purpose and need of the project was to optimize the amount of land required for the project without compromising the viability of the remaining undeveloped property as a working ranch.

Id. at 317-18.

This statement implies that there is a limit to the amount of Ranch property that could be used for the Canyon Club development without compromising the Ranch's viability. Yet, none of the alternatives that were considered led Canyon Club or the Corps to examine whether any commitment of Ranch property beyond the 359 acres would exceed this limit, nor does the administrative record contain any evidentiary support for such a conclusion.[13]

Nevertheless, under the circumstances of this case, we do not hold that the Corps' failure to require Canyon Club to prove the impracticability of committing more Ranch property to the development renders its decision arbitrary and capricious. The CWA guidelines instruct the Corps to "recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation

---

[13]In the TRO hearing before the district court, Mr. Edgcomb did claim that any further reduction in the size of the Ranch would destroy its ability to operate as a ranch. No evidence was produced in support of this claim, however. Moreover, Mr. Edgcomb's statement at the hearing is not part of the administrative record before us.

should reflect the significance and complexity of the discharge activity." 40 C.F.R. § 230.6(b). They further state that "[a]lthough all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities." Id. § 230.10.

Here, the Corps' level of effort and documentation was in accord with this standard. As required by the CWA guidelines, the Pioneer § 404(b)(1) analysis includes detailed factual determinations on "the nature and degree of effect that the proposed discharge will have . . . on the structure and function of the aquatic ecosystem and organisms," in particular on the "physical, chemical, and biological components of the aquatic environment." 40 C.F.R. § 230.11(e). Overall, while 1.45 acres of wetlands would be eliminated through fill for construction of golf features and home sites, the function and vegetation diversity of remaining jurisdictional wetlands, comprising 32.65 acres, would improve due to the removal of cattle grazing. Additional wetlands would be added as part of the project's mitigation efforts; a Snake River tributary, Martin Creek, would be restored, providing new trout spawning habitat; and the bendway weirs, if installed, were

predicted to increase riffle and pool complexes on the Snake River, considered a beneficial effect.[14]

The Corps also concluded that "all of the alternatives [considered] would have similar effects on . . . bald eagles" and that these impacts were not "unacceptable." Appellants' App. Vol. 2 at 227. This conclusion was partly based on the Corps' assessment that the possibility of an "incidental take" of bald eagles was "greatly reduced" by the terms and conditions imposed by FWS on the Canyon Club development. Id. As described above, these restrictions would prohibit construction within 400 meters of a nest containing eagle chicks for the first three weeks after hatching and would otherwise require construction work near the

---

[14]For this conclusion on the impact of bendway weirs, Pioneer and the Corps relied on a study prepared by Ayres Associates which found significant erosion and thus the possible need for bank stabilization using bendway weirs on two locations on the Canyon Club property. The study concluded that the weirs would "creat[e] and enhance[] aquatic habitat." Appellants' App. Vol. 2 at 206. As the appellants indicate, the beneficial impact of the weirs was questioned by the EPA and by a U.S. Forest Service geomorphologist in their responses to the 359-acre proposal. They noted that the weirs may cause channel migration or erosion downstream, on the opposite bank, or on islands currently located in this portion of the Snake River. The Corps acknowledged these comments in its decision document but noted that it would "adopt monitoring requirements to ensure that weirs are functioning as designed and may require modification or removal of weirs if unacceptable effects on the Snake River are documented." Id. at 233. The Corps concluded that "the proposed bendway weir construction is not likely to adversely affect the proper function of the Snake River and associated floodplain." Id. The Corps is entitled to rely on its own experts even when their opinions conflict with those of other federal agencies, as long as its decisions are not arbitrary and capricious. Lee v. U.S. Air Force, 354 F.3d 1229, 1242 (10th Cir. 2004).

Snake River during nesting season to take place only between 9 am and 6 pm in order to reduce impacts on eagle foraging activities. Any bendway weir construction would have to take place outside the nesting season.

Apart from these restrictions, which the Corps legitimately took into account, we understand the Corps' conclusion to reflect its recognition that the primary cause of the predicted adverse impact on eagles – increased human activity resulting from development on the property – was in a large sense unavoidable.[15] The record indicates that the bald eagles and their progeny cannot

_____

[15]We note that our understanding of the Corps' analysis differs from that of the district court. We disagree with the district court's assertion that environmental impacts of "upland aspects of the overall project" are never relevant to the Corps' analysis under the CWA guidelines. Order on Pet. for Review of Agency Action, No. 02-CV-1036-D, slip op. at 10 (D. Wyo. 2003). First, the district court appears to have misread the record on this point. It quoted language in the Corps' decision document that, the court asserted, presented a contrast between discharge impacts and upland impacts. In fact, this language merely explains the difference between the analyses required under NEPA and under the CWA guidelines. The Corps states: "Under the guidelines, the analysis is conducted with an emphasis on aquatic resources which is more integral [than effects on various other public interest factors] to the Corps' authority regarding permit decisions." Appellants' App. Vol. 2 at 233. We understand the phrase "aquatic resources" to encompass the physical, chemical, and biological characteristics of the aquatic ecosystem, in accord with the CWA's goal and as laid out in 40 C.F.R. Part 230 Subparts C and D. Second, the district court's upland/discharge distinction was evidently drawn from case law excluding independent upland developments from the scope of the Corps' NEPA analysis. See Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1115-17 (9th Cir. 2000); Sylvester v. U.S. Army Corps of Eng'rs, 884 F.2d 394, 396, 400 (9th Cir. 1989). The distinction does not appropriately apply to the CWA alternatives analysis, which, again, focuses on impacts to the "aquatic

(continued...)

be fully protected simply by moving all dredge and fill activities more than 400 meters away from all nests. FWS' BiOp states that while the area within 400 meters of an occupied eagle nest is the "most sensitive to human disturbance," the recommended buffer around nests is one mile. Appellants' App. Vol. 4 at 837. The BiOp indicates that all three nesting territories could be negatively impacted by the proposed action, due to "increased recreational activity, increased overall human intrusion, and changes in habitat quality," even though no golf course features or housing lots were planned within 400 meters of the active Cabin Creek nest, and only a portion of one hole would lie within 400 meters of the Dog Creek nest. Id. at 847.

The Pioneer § 404(b)(1) analysis similarly states that "[d]evelopment of the Canyon Club property would facilitate activities that could have indirect effects on

---

[15](...continued) ecosystem." 40 C.F.R. § 230.10(a). The CWA guidelines define "aquatic ecosystem" to mean "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." Id. § 230.3(c). Guideline § 230.30 acknowledges that "nesting areas, protective cover, adequate and reliable food supply, and resting areas for migratory species" may be "[e]lements of the aquatic habitat" that are "particularly crucial to the continued survival of some threatened or endangered species." Id. § 230.30(b)(2). A discharge of dredged or fill material may adversely affect these species either by directly impacting these elements, id., or by "*[f]acilitating incompatible activities*," id. § 230.30(b)(3) (emphasis added). Thus, here, the Corps' § 404(b)(1) analysis should, and we believe did, take into account the impact of the Canyon Club development as a whole on bald eagle nesting and foraging habitat.

nesting bald eagles due to disturbance from construction, operation, use of the Canyon Club golf course, and housing development and occupation." Id. Vol. 2 at 333. These effects would occur under "any of the action alternatives" and would not be "the direct result of filling within wetlands."[16] Id.

Even the "no-action" alternative was predicted to have similar, if not worse, impacts, in light of Canyon Club's clear assertion throughout the permit application process that were the Corps to deny it a § 404 permit, the River Bend Ranch would likely be dismantled, and its remaining property, along with the Canyon Club property, would likely be converted into a residential development containing up to 250 houses. Although these houses would not be constructed on top of wetlands or (under the terms of Teton County LDRs) within 400 meters of bald eagle nests, the human intrusion would at least equal that expected from the Canyon Club 359-acre proposal. Moreover, the 332 acres of conservation

---

[16]The appellees cite this statement as evidence that bald eagles are not part of the "aquatic ecosystem" in question, pointing also to the further statement in this section of the § 404(b)(1) analysis that "[the bald eagle does not] directly depend on these wetlands, although [it] is significantly dependent on the Snake River as a source for food." Appellants' App. Vol. 2 at 333. The appellees evidently agree that bald eagles are part of the Snake River aquatic ecosystem but distinguish this from the ecosystem of the adjacent wetlands. Since the Corps never made such a distinction explicit in the administrative record and instead considered impacts of the project as a whole on bald eagle habitat, we decline to address the issue further here. Alameda Water & Sanitation Dist. v. Browner, 9 F.3d 88, 91 (10th Cir. 1993) ("'The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943))).

easements that are associated with the 359-acre proposal and are intended primarily "to provide secure habitat for bald eagles," id. Vol. 4 at 834, would not be established, and other mitigation measures, such as the use restrictions drafted for the Canyon Club Declaration, might also be abandoned.

Thus, even assuming that the appellants' suggested alternatives may incrementally reduce impacts to bald eagles by removing specific features from the 400-meter radius around their nests, the record suggests that these measures would not be significant relative to the impact on eagles of the development as a whole. We therefore hold that the Corps' level of effort and documentation in its CWA alternatives analysis and its conclusion that the 359-acre proposal was the least damaging practicable alternative were not arbitrary or capricious.

## 2. Decision Not to Prepare an EIS Under NEPA

While the CWA imposes substantive restrictions on agency action, NEPA imposes procedural requirements aimed at integrating "environmental concerns . . . into the very process of agency decision-making." Andrus v. Sierra Club, 442 U.S. 347, 350 (1979). Under NEPA, when a federal agency undertakes a "major Federal action[] significantly affecting the quality of the human environment," it must prepare an environmental impact statement ("EIS") that details, among other things, the environmental impacts of the proposed action, any adverse

environmental effects that would occur as a result, and alternatives to the proposed action.  42 U.S.C. § 4332(2)(C).  When it is unclear whether a proposed action requires an EIS, the agency may first prepare a less detailed environmental assessment ("EA").  40 C.F.R. § 1501.4(b).  If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact ("FONSI") and forego the further step of preparing an EIS.  Id. § 1501.4(e); see Lee, 354 F.3d at 1237.

Here, as described above, the Corps prepared an EA and issued a FONSI. The appellants challenge this decision, claiming that an EIS was required because "the Canyon Club project will wipe out regionally significant bald eagle nests, alter the natural flow of the Snake River, and place major human development in a river corridor deemed eligible for wild and scenic designation."  Appellants' Br. at 41.

"'An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise.'"  Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1213 (10th Cir. 2002) (quoting Comm. to Preserve Boomer Lake Park v. Dep't of Transp., 4 F.3d 1543, 1555 (10th Cir. 1993)); see Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1225-26 (10th Cir. 2002) ("The initial decision as to the necessity of an EIS is the agency's, not a reviewing court's.").  Our review of this decision requires us to

determine "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002) (internal quotation marks omitted). This review, therefore, "has a substantive component" in addition to the procedural determination of whether the agency considered the relevant factors. Id. Accordingly, if the appellants "can demonstrate substantively" that the agency's conclusion "represents a 'clear error of judgment,' then that conclusion must be reversed." Id. (quoting Utah Shared Access Alliance, 288 F.3d at 1213) (further quotation omitted).

In determining whether an action will significantly affect the environment, agencies must consider both the context in which the action will take place and the intensity of its impact. See 40 C.F.R. § 1508.27; Utah Shared Access Alliance, 288 F.3d at 1214. Among the factors relevant to this determination, as listed in NEPA's implementing regulations, are the "[u]nique characteristics of the geographic area [in which the action would take place] such as [its] proximity to . . . wetlands, wild and scenic rivers, or ecologically critical areas"; "[t]he degree to which the effects . . . are likely to be highly controversial"; "[t]he degree to which the possible effects . . . are highly uncertain"; and "[t]he degree to which the action may adversely affect an endangered or threatened species or its [critical] habitat." 40 C.F.R. § 1508.27(b)(3)-(5), (9).

The appellants claim that "[e]ach of these factors required preparation of an EIS in this case." Appellants' Br. at 43. They specifically focus their arguments on the unique value of this stretch of the Snake River for bald eagle nesting, the project's expected impact on the three eagle nests, and the disagreement between the Corps and other agencies over the impact of bendway weirs.[17]

First, in regard to the bendway weirs, the record does not support the appellants' claim that there was "substantial uncertainty and controversy about the consequences of the bendway weirs." Appellants' Br. at 44. The Pioneer EA addressed the impact of the weirs, noting that the choice of weirs as a bank stabilization method was based on Canyon Club's research of "the best possible means to successfully protect property values and riparian habitat from further erosion without impacting the river channel." Appellants' App. Vol. 3 at 433. Other flood control measures, such as installation of dikes or levees of the sort that have been used on upstream portions of the Snake River, were not contemplated, but the record indicates that those measures are considered to have greater river impacts than bendway weirs. The design and function of the weirs at

---

[17]Although the appellants mention that the portion of the Snake River adjacent to the Canyon Club property is eligible for wild and scenic river designation, they do not explain how the Canyon Club development would affect this eligibility. We therefore do not address this argument beyond noting that the Corps' decision document indicates its awareness that the river within Snake River Canyon is considered eligible. See Appellants' App. Vol. 2 at 228.

the proposed site were described and assessed in a report prepared by Ayres Associates, a consulting firm. As indicated above, the Corps incorporated the Pioneer EA and referenced the Ayres report in its decision document and approved construction of the weirs with the condition that Canyon Club receive advance approval of the final plans before construction begins.

While the EPA raised general concerns about the impact of the weirs and the U.S. Forest Service geomorphologist criticized aspects of the Ayres report, we do not believe these comments obligated the Corps to evaluate the impact of the weirs further in an EIS. Neither comment provides "evidence . . . [that] casts serious doubt upon the reasonableness of [the Corps'] conclusions." Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 736 (9th Cir. 2001). The Corps responded to these comments by adopting monitoring requirements "to ensure that weirs are functioning as designed" and stated that the weirs would be modified or removed "if unacceptable effects on the Snake River are documented." Appellants' App. Vol. 2 at 233. We believe the circumstances here are unlike those considered in National Parks, 241 F.3d at 737, where the court held that a federal agency could not avoid preparing an EIS by promising to study as yet unknown consequences after implementing the action. Here, the Corps asserts that it has sufficient information to conclude that the weirs will not have a significant impact on the river but has adopted monitoring requirements in case its conclusion

is wrong. The appellants have not demonstrated that the Corps' conclusion represents a clear error in judgment.

In regard to bald eagle impacts, the record clearly establishes that this stretch of the Snake River has long been an important and productive bald eagle nesting territory. The fact that FWS has not designated this, or any, territory as the bald eagle's "critical habitat" does not alone persuade us that its potential destruction should not be considered "significant" for purposes of NEPA. See Middle Rio Grande Conservancy Dist., 294 F.3d at 1224 n.1, 1226 (discussing difficulties in the process of designating critical habitat). Nor do we consider determinative FWS's conclusion that the Canyon Club project was not "likely to jeopardize the continued existence of the bald eagle" as a species. Appellants' App. Vol. 4 at 851. At the same time, however, FWS's issuance of an incidental take statement "anticipating" the loss of some members of a threatened species does not automatically lead to the requirement to prepare a full EIS. See Ramsey v. Kantor, 96 F.3d 434, 437 (9th Cir. 1996) (holding that issuance of an incidental take statement was a "major federal action" under NEPA that required an EA "and possibly" an EIS); Fund for Animals, Inc. v. Rice, 85 F.3d 535, 546-47 (11th Cir. 1996) (holding that the Corps' decision not to prepare an EIS in connection with a landfill was not arbitrary where FWS had issued an incidental take statement

anticipating that the project would kill up to 130 Eastern Indigo Snakes, a threatened species).

As discussed above, the Corps concluded that the conditions imposed by FWS on the Canyon Club development "greatly reduced" the chance that any eagles would in fact be taken, despite the continuing potential for disturbance due to increased human activity in the area. At the time the Corps reached this conclusion, it had before it the Pioneer BA and the FWS BiOp, both of which focused extensively on the project's impacts on bald eagles. Despite the fact that Snake River Canyon was already a "well-known and extensively studied bald eagle habitat area," Appellants' App. Vol. 4 at 838, these documents could not predict with certainty how the resident bald eagles would react to the Canyon Club development. It appears that this uncertainty stemmed not from a lack of thoroughness in investigating potential impacts but primarily from the fact that "[r]esponses of eagles to human disturbances vary depending on the eagle individual/pair." Id. at 837. Further, although "some eagles in the Snake Unit population have shown some tolerance of human disturbance in the past, . . . eagle behavior varies greatly among individuals and by circumstance. Therefore, the past behavior of eagle pairs cannot be used to predict the future behavior of these and other eagle pairs within the Snake Unit." Id. at 850. The record thus indicates that further assessment of impacts in an EIS before the project's implementation is

unlikely to be productive.  Cf. Nat'l Parks & Conservation Ass'n, 241 F.3d at 737 (requiring an EIS "when there is a reasonable possibility that [the currently lacking] information can be obtained in connection with the preparatory process"); Fund for Animals, 85 F.3d at 546 (concluding that the information already before the Corps, including two FWS biological opinions, demonstrated that the Corps took "a hard look at the project before deciding to forego the time and administrative costs of preparing an [EIS]").

At the same time, as we discussed earlier, the project as proposed, and as modified by the conditions imposed by FWS, does incorporate a number of mitigation measures designed to reduce the potential impact on bald eagles.  These measures include close daily monitoring of active eagle nests during the construction process, with the requirement that construction activities be modified immediately if eagle disturbance is observed.  Moreover, monitoring will continue for five years after construction is completed in order to evaluate the actual effect on bald eagles of the development as a whole.

In light of the evident difficulty in predicting eagle reactions before the Canyon Club development begins, the Corps could justifiably determine that these mitigation measures "constitute an adequate buffer" against adverse impacts to bald eagles so as to "render such impacts so minor as to not warrant an EIS." Wetlands Action Network, 222 F.3d at 1121; see also Nat'l Parks & Conservation

Ass'n, 241 F.3d at 735 (contrasting its circumstances with Wetlands Action Network, where, as here, "the imposition of special conditions, enforced through a permit, and reviewed by various other agencies ensured that the measures would be enforced in a manner that properly reduced negative environmental impact"). Accordingly, we conclude that the appellants have failed to demonstrate that the Corps made a clear error in judgment or did not consider the factors relevant to the project's impacts on bald eagles.

We thus hold that the Corps' decision not to prepare an EIS was not arbitrary or capricious.


## 3. Consideration of Alternatives Under NEPA

Like the CWA, NEPA requires federal agencies to consider alternatives to a proposed action. 42 U.S.C. § 4332(2)(E). An agency's obligation to consider reasonable alternatives is "operative even if the agency finds no significant environmental impact." Highway J Citizens Group v. Mineta, 349 F.3d 938, 960 (7th Cir. 2003) (internal quotation marks omitted); see Davis, 302 F.3d at 1120 ("A properly-drafted EA must include a discussion of appropriate alternatives." (citing 40 C.F.R. § 1508.9(b))).

Unlike the "least damaging practicable alternative" requirement under the CWA, however, the NEPA analysis "'does not mandate particular results.'" Lee,

354 F.3d at 1237 (quoting Utahns for Better Transp., 305 F.3d at 1162).  In our review under NEPA, therefore, we only consider whether an agency's decisions regarding which alternatives to discuss and how extensively to discuss them were arbitrary, keeping in mind that such decisions are "necessarily bound by a 'rule of reason and practicality.'"  Airport Neighbors Alliance, Inc. v. United States, 90 F.3d 426, 432 (10th Cir. 1996) (quoting Comm. to Preserve Boomer Lake Park, 4 F.3d at 1551); see Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991).  Our goal is to ensure that the agency gathered "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned."  Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999) (internal quotation marks omitted).

The appellants allege that the Corps' consideration of alternatives violated NEPA because it "was rigged from the start" to favor Canyon Club's preferred 359-acre proposal.  Appellants' Br. at 22.  Specifically, the appellants claim that all the alternatives considered, except for the 359-acre proposal, were "non-starter[s]" because they either violated county LDRs or failed to serve the project's stated purpose.  Id. at 24-25.  The appellants thus compare the Corps' discussion of alternatives here to that in Davis, 302 F.3d at 1122, where we rejected as inadequate an agency's "conclusory and perfunctory" dismissal of alternatives that

left only the proposed action and a no-build alternative to be considered in detail in an EA.

We do not believe the comparison with Davis is apt. Davis involved construction of a five-lane highway over a six-block distance and the failure of the agency involved to consider any alternative location for this new road, or any modification to the project design that had potential to mediate its impact. Id. at 1119-20. We ruled that this failure was arbitrary in light of what we discerned was the project's "general overarching objective of improving traffic flow in the area," in addition to record evidence suggesting two viable alternative locations. Id. at 1119.

Here, in contrast, the record indicates that, by the time the Corps' EA was prepared, Canyon Club and the Corps had seriously considered various alternatives. As described above, the 286-acre proposal was originally the preferred alternative. As a result of "facilitation meetings with members of the public who had expressed opposition to the project," Appellants' App. Vol. 3 at 390, discussions with the Teton County Planning Staff concerning the development of LDRs for golf courses, and input from the Corps, Canyon Club first considered a minor adjustment to the 286-acre design, then agreed to redesign the development using additional Ranch land. The 359-acre proposal emerged from this process.

The Pioneer EA discusses the alternatives that were considered and rejected during these negotiations. These included the modified 286-acre alternative and a nine-hole golf course alternative rejected because there was no market for nine-hole golf courses. The Pioneer EA then assesses impacts associated with a no-action alternative, the 286-acre proposal, and the 359-acre proposal. As in the § 404(b)(1) analysis described above, its discussion of the "no-action" alternative assumes that failure to obtain a permit will result in full residential development on the Canyon Club and River Bend Ranch properties. The Pioneer EA notes that the 286-acre proposal "is included in this document because . . . it remains a viable alternative, from the perspective of [Canyon Club]." Id. at 391. The Corps' EA/decision document incorporated this analysis and also discussed, but rejected as infeasible, the possibility of locating the development elsewhere in Teton County.

These documents thus reflect the fact that, by the time they were prepared, it was largely recognized that the 359-acre proposal was the only alternative considered that would satisfy the newly-formulated Teton County LDRs and the project's purpose. However, this does not appear to be the result of "defining the objectives of [the project] in terms so unreasonably narrow they can be accomplished by only one alternative." Colo. Envtl. Coalition, 185 F.3d at 1174. Canyon Club's own description of the purpose of its project included its desire to

preserve River Bend Ranch by obtaining income from an eighteen-hole golf course and upscale residential development while also minimizing the impacts of development on scenery and the environment. The Corps reviewed this description and largely adopted it after determining that "there is a market need for the project and that the project is economically viable." Appellants' App. Vol. 2 at 220. We do not believe Canyon Club's description of purpose is so narrow or unbalanced that the Corps, by accepting it, abdicated its own "responsibility for defining the objectives of an action." Colo. Envtl. Coalition, 185 F.3d at 1175.

As indicated above, the appellants have submitted extra-record evidence in the form of the Speidel affidavit, which claimed that the Canyon Club development could be reconfigured so as to move all housing and golf course features up to one mile away from the active Cabin Creek nest and at least 400 meters away from the other nests. While in some circumstances such evidence may be admissible in order to illuminate whether an agency has "failed adequately to discuss some reasonable alternative," Lee, 354 F.3d at 1242 (internal quotation marks omitted), we do not believe the district court erred in refusing to consider the Speidel declaration in light of the sliding scale by which we must measure an agency's obligations under NEPA. See Highway J Citizens Group, 349 F.3d at 960. When an agency "makes an informed decision that the environmental impact will be small, a view which we are required to accord deference," and which here

we have already upheld, "a less extensive search [for reasonable alternatives] is required." Id. (internal quotation marks omitted). As the Corps did not have Speidel's suggested alternatives before it, it did not act arbitrarily in failing to consider them.

At oral argument, the appellants pointed out that they, and the public in general, did not have access to a description of the alternatives that were under consideration before the public comment period ended on December 20, 2001. It is true that the Corps' public notice did not describe any alternatives, and the record does not indicate that the Pioneer EA, other Pioneer documents, or the FWS BiOp were made available to the public before the Corps issued its decision. The notice did, however, include maps detailing the layout of the 359-acre proposal. It also stated that "the project is likely to adversely affect bald eagles."[18] Appellants' App. Vol. 2 at 257. Further, NEPA's public involvement requirements

_____

[18]We also note that, as indicated above, after notice of the original 286-acre proposal was issued, a series of meetings took place between Canyon Club and others, including environmental groups, regarding various possible alternatives and how to reduce bald eagle impacts. The record does not indicate whether the appellants were involved in these discussions. However, in its response to the notice of the 359-acre proposal, one of the appellants, the Jackson Hole Conservation Alliance, indicated its awareness of the original proposal, stating that Canyon Club had "clearly made a concerted effort to . . . address several of our previously unresolved wildlife . . . concerns." Appellants' App. Vol. 2 at 307. The response also incorporated comments by Jackson Hole Trout Unlimited recognizing the potential for the incidental take of two eagle nests and thus urging "rigorous mitigation and responsible monitoring." Id. at 303.

are not as well defined when an agency prepares only an EA and not an EIS. Compare 40 C.F.R. § 1503.1, .4 (requiring agencies preparing an EIS to make an initial draft available for public comment and to consider "[d]evelop[ing] and evaluat[ing] alternatives not previously given serious consideration" in response to comments), with id. § 1501.4(b) (requiring agencies to "involve . . . the public, to the extent practicable, in preparing [EAs]"); id. § 1501.4(e)(2) (requiring agencies to make a FONSI available for public review prior to their final decision only in specific circumstances not applicable here); see also Pogliani v. U.S. Army Corps of Eng'rs, 306 F.3d 1235, 1238-39 (2d Cir. 2002) (holding plaintiffs were unlikely to succeed on their claim that the Corps "erred by failing to release its draft EA and FONSI for public comment prior to their issuance").  We therefore reject this argument as grounds for holding that the Corps acted arbitrarily.

We thus uphold the Corps' consideration of alternatives under NEPA.


## CONCLUSION

Having thoroughly reviewed the administrative record, we AFFIRM the decision of the district court and uphold the Corps' issuance of a § 404 permit in this case.