FILED
United States Court of Appeals
Tenth Circuit

July 7, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FOREST GUARDIANS,

       Plaintiff-Appellant,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE,

       Defendant-Appellee,

and

THE PEREGRINE FUND,

       Defendant-Intervenor-
       Appellee.

_____

ENVIRONMENTAL DEFENSE
FUND, NEW MEXICO CATTLE
GROWERS' ASSOCIATION,

       Amicus Curiae.

No. 08-2226

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:06-CV-00231-WJ-KBM)**

James J. Tutchton (Melissa Hailey with him on the briefs), Forest Guardians, Denver, Colorado, for Plaintiff-Appellant.

Anna T. Katselas, Attorney, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C. (John C. Cruden, Acting Assistant Attorney General; M. Alice Thurston, Joseph H. Kim, and Brian McLachlan, Attorneys, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Justin S. Tade, Attorney-Advisor, U.S. Department of the Interior, Southwest Regional Solicitor's Office, with her on the brief), for Defendant-Appellee.

Frank M. Bond (Faith Kalman Reyes with him on the brief), Simons & Slattery, LLP, Sante Fe, New Mexico, for Defendant-Intervenor-Appellee.

Daniel Grossman, Environmental Defense Fund, Boulder, Colorado, as Amicus Curiae in support of Appellees.

Karen Budd-Falen and Kathryn Brack Morrow, Budd-Falen Law Offices, LLC, Cheyenne, Wyoming, for New Mexico Cattle Growers' Association, as Amicus Curiae in support of Appellees.

---

Before **GORSUCH**, **McKAY**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Forest Guardians[1] appeals the denial of its petition for review of the U.S. Fish and Wildlife Service's ("FWS") decision to reintroduce a nonessential experimental population of endangered Northern Aplomado Falcons ("Falcons") into southern New Mexico.  Forest Guardians contends that the FWS violated

---

[1]    Since the time of the events at issue in this appeal, the Appellant Forest Guardians merged with another group and changed its name to WildEarth Guardians.  In keeping with the practice of the district court and the parties, throughout this opinion we continue to refer to the Appellant as Forest Guardians rather than WildEarth Guardians.

section 10(j) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(j), when it allegedly promulgated a final rule to release captive-bred Falcons within the current range of the species and in an area that is not wholly separate geographically from an existing Falcon population. Forest Guardians also argues that the FWS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f, when it decided to release captive-bred Falcons before completing its environmental impact analysis. Because the FWS allegedly had predetermined the outcome of its NEPA analysis, Forest Guardians claims that the FWS failed to take the requisite "hard look" at the environmental impacts of its proposed action. The district court rejected both arguments. We exercise jurisdiction under 28 U.S.C. § 1291 and **AFFIRM** the district court's denial of the petition for review.

## I.  BACKGROUND

Forest Guardians contends that the Falcon, an endangered species, should be permitted to repopulate the United States naturally, while enjoying full protection of its yet-to-be-designated critical habitat under the ESA. On the other hand, the FWS and The Peregrine Fund, which intervened in this action, advocate the release of captive-bred Falcons into southern New Mexico, while decreasing the Falcon's protection under the ESA. Our task is not to decide which strategy is more scientifically sound; rather, we must review the 10(j) rule under the Administrative Procedure Act ("APA") to determine if the rule was promulgated in accordance with the ESA and NEPA.

3

**A. Extirpation and Possible Restoration of the Falcon in the United States**

The Falcon, "perhaps one of our most colorful birds of prey,"[2] Determination of the Northern Aplomado Falcon To Be an Endangered Species, 51 Fed. Reg. 6686, 6686 (Feb. 25, 1986) (to be codified at 50 C.F.R. pt. 17), is a medium-sized subspecies of the aplomado falcon historically located in the "savannas, coastal prairies, and higher-elevation grasslands" stretching across the southwestern United States through Mexico and into Guatemala and Nicaragua. Dean P. Keddy-Hector, *Aplomado Falcon*, The Birds of North America, No. 549, at 1, 1 (2000); *accord* Determination of the Northern Aplomado Falcon to Be an Endangered Species, 51 Fed. Reg. at 6686. The Falcon is the only subspecies of the aplomado falcon to be recorded in the United States. Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. 42,298, 42,298 (July 26, 2006) (to be codified at 50 C.F.R. pt. 17).

In 1986, the Secretary of the Interior ("Secretary") listed the Falcon as endangered[3] because it had been extirpated from its historic range in Arizona, New Mexico, and Texas for approximately thirty years and was known to nest only in Mexico. Determination of the Northern Aplomado Falcon To Be an Endangered

---

[2] The Peregrine Fund also describes the Falcon as "a beautiful, charismatic raptor." The Peregrine Fund Br. at 1 (hereinafter "TPF Br.").

[3] With an exception not relevant here, the ESA states that "[t]he term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

Species, 51 Fed. Reg. at 6686. As of 1986, the Falcon had not nested in the United States or northern Mexico since the discovery of nests near Deming, New Mexico, and in northern Chihuahua in 1952. *Id.* The Secretary determined that the main factor leading to the Falcon's disappearance was "habitat degradation due to brush encroachment" and that "the most serious threat to th[e] falcon [wa]s the continued use of DDT and other persistent pesticides within the ranges of the falcon and some of its prey species." *Id.* at 6686; *see also id.* at 6687, 6688. The Secretary concluded that "the species is sensitive to habitat degradation and chemical contamination, and needs the type of active management and protective measures provided for in the [ESA]." *Id.* at 6688.

In listing the Falcon as endangered, the Secretary did not designate a critical habitat.[4] *Id.* The Secretary found that such a designation "[w]as not prudent . . .

---

[4] Critical habitat is defined as "the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," as well as "specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A). Designation of areas as critical habitat requires federal agencies to ensure that their actions are not likely to result in the destruction or adverse modification of the critical habitat; agencies must both prevent extinction of the species and allow for its recovery so that the species may be removed from the list of endangered species ("delisted"). *Ctr. for Native Ecosys. v. Cables*, 509 F.3d 1310, 1321–22 (10th Cir. 2007) (citing 16 U.S.C. §§ 1532(3), (5), 1536(a)(2)). Although "[c]ritical habitat shall be specified to the maximum extent prudent and determinable at the time a species is proposed for listing," 50

(continued...)

because there [wer]e no known active nesting areas within the past 25 years in the United States." *Id.* Although the Falcon continued to reside in portions of Mexico, the Secretary noted that "[c]ritical habitat is not designated in areas outside U.S. jurisdiction." *Id.* (citing 50 C.F.R. § 424.12(h)).

In September 2002, Forest Guardians petitioned the FWS to designate critical habitat for the Falcon, pursuant to 16 U.S.C. § 1533(b)(3)(D)(i), after a pair of Falcons successfully nested in Luna County, New Mexico in 2001 and bred chicks in 2002. Forest Guardians contended that the FWS should designate a critical habitat for the Falcon in Arizona, New Mexico, and Texas because the Falcon was no longer extirpated from the United States. In subsequent years, other wild Falcons were increasingly sighted in that area. Nevertheless, the FWS did not respond to the petition.

## B. Proposed 10(j) Rule

In 2005, the FWS proposed a rule under section 10(j) of the ESA that would reintroduce captive-bred Falcons into New Mexico and Arizona in an attempt to

---

[4](...continued)
C.F.R. § 424.12(a) (2008), designation of critical habitat is not appropriate if it "would not be beneficial to the species," *id.* § 424.12(a)(1)(ii). Moreover, "[c]ritical habitat shall not be designated within foreign countries or in other areas outside of United States jurisdiction." *Id.* § 424.12(h). Critical habitat may be established later, even if it is not previously designated. 16 U.S.C.§ 1532(5)(B).

establish a viable resident population of Falcons.[5]  Establishment of a Nonessential

Experimental Population of Northern Aplomado Falcons in New Mexico and

Arizona and Availability of Draft Environmental Assessment, 70 Fed. Reg. 6819,

6819 (Feb. 9, 2005) (to be codified at 50 C.F.R. pt. 17).  Section 10(j) allows the

Secretary to authorize the release of an experimental population of an endangered

species "outside the current range of such species if the Secretary determines that

such release will further the conservation of such species."  16 U.S.C. §

1539(j)(2)(A).  Ordinarily, such a population "shall be treated as a threatened

species,"[6] rather than as an endangered species.  *Id.* § 1539(j)(2)(C).  If "an[]

_____

[5]      Although we will discuss section 10(j) in greater detail, *infra*, we
introduce the concept of a 10(j) rule by noting that section 10(j) of the ESA
provides the Secretary with "flexibility and discretion in managing the
reintroduction of endangered species."  *Wyo. Farm Bureau Fed'n v. Babbitt*, 199
F.3d 1224, 1233 (10th Cir. 2000).  "By regulation, the Secretary can identify
experimental populations, determine whether such populations are essential or
nonessential, and, consistent with that determination, provide control mechanisms
(*i.e.*, controlled takings) where the [ESA] would not otherwise permit the exercise
of such control measures against listed species."  *Id.*

[6]      The ESA provides that "[t]he term 'threatened species' means any
species which is likely to become an endangered species within the foreseeable
future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).
Congress's goal in enacting the ESA unquestionably was to safeguard *both*
endangered and threatened species.  *See id.* § 1531(c)(1) ("It is further declared to
be the policy of Congress that all Federal departments and agencies shall seek to
conserve endangered species *and* threatened species and shall utilize their
authorities in furtherance of the purposes of this chapter." (emphasis added)); *Rio
Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1104 (10th Cir.
2010) ("Listing a species as endangered or threatened under 16 U.S.C. § 1533
triggers the ESA's provisions."); *Gordon v. Norton*, 322 F.3d 1213, 1215 (10th
Cir. 2003) ("The ESA is designed to protect and conserve endangered *and*

(continued...)

experimental population [is] determined . . . to be *not essential* to the continued existence of a species," the Secretary may *not* designate critical habitat for that population. *Id.* § 1539(j)(2)(C)(ii) (emphasis added). The FWS intended the proposed 10(j) rule to fulfill one of the goals identified in the Falcon's Recovery Plan, *viz.*, to reestablish the Falcon in the United States.

The FWS proposed to release captive-bred Falcons and "to designate this reintroduced population as a nonessential experimental population . . . according to

<sup>6</sup>(...continued)
threatened species and the ecosystems upon which they may be conserved." (emphasis added)); *see also N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1282 (10th Cir. 2001) ("The process set forth in the ESA for the protection of endangered *and* threatened species and the conservation of their ecosystem begins by granting the Secretary of the Interior, through the FWS, authority to list species in need of protection as either endangered or threatened." (emphasis added)). However, the FWS has more regulatory leeway concerning the crafting and implementation of protections for threatened species. In particular, the ESA's protections automatically extend by statutory mandate to species designated as endangered, but they do not do so with regard to species denominated as threatened; it is through administrative rulemaking that the latter receive a measure of the ESA's protections—including protection against takings—and they do so only to the extent that the FWS considers the protections to be necessary and appropriate for their conservation. *See Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 3 (D.C. Cir. 1993) ("On its face, 16 U.S.C. § 1538(a)(1) applies its prohibitions, including the prohibition against takings, only to endangered species. However, the ESA allows the FWS to apply these prohibitions to threatened species, as well."); Andrew A. Smith, Margaret A. Moote & Cecil R. Schwalbe, *The Endangered Species Act at Twenty: An Analytical Survey of Federal Endangered Species Protection*, 33 Nat. Resources J. 1027, 1038 (1993) ("Threatened species do not receive protection from taking automatically, but the Secretary may make any portion or all of section 9 [of the ESA] applicable as required for their conservation."); *see also* 16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.").

8

section 10(j) of the [ESA]."[7] Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona and Availability of Draft Environmental Assessment, 70 Fed. Reg. at 6819. In support of this proposed 10(j) rule, the FWS stated that "the continued pesticide influence, shrub encroachment into Chihuahuan grasslands, low densities of avian prey in some areas, and the increased presence of the great horned owl . . . , which preys upon the falcon, may be limiting recovery of the species." *Id.* at 6821. The FWS noted that there had been "no documented nesting attempts by wild birds in New Mexico between 1952 and 2001 . . . [and] no verified sightings of falcons in Arizona since 1940." *Id*. The FWS acknowledged that "[s]poradic sightings of falcons have occurred in New Mexico with sightings from every decade since the 1970s." *Id*. However,

> at least some of these sightings may be juvenile birds that are dispersing from existing populations in the Mexican state of Chihuahua. Any significant natural re-colonization of habitats in Arizona and New Mexico would likely take decades, if it occurred at all, because the reproductive rate of the population

---

[7] The FWS concluded that the experimental population was *nonessential* to the continued existence of the Falcon because: (1) there were three existing populations of Falcons (in eastern Mexico, in northern Chihuahua, Mexico, and in southern Texas), so "[t]he threat of extinction from a single catastrophic event" was decreased and any "loss of the experimental population w[ould] not appreciably reduce the likelihood of falcon survival in the United States," and (2) "[a]ny [Falcon]s lost during the reintroduction attempt c[ould] be replaced through captive breeding." Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona and Availability of Draft Environmental Assessment, 70 Fed. Reg. at 6823.

in Mexico has declined . . . .

*Id.*

The FWS concluded that the presence of Falcons in the proposed nonessential experimental population area was too minimal to constitute a population. *See id.* at 6822. Based on annual Falcon surveys in New Mexico, the first documented successful nesting attempt in fifty years occurred in Luna County, New Mexico, in 2001. *Id.* That nesting pair fledged three chicks in 2002. *Id.* However, "[i]n 2003, only a single female [Falcon] was seen in the area of [that] nest." *Id.* "In 2004, a pair of falcons was seen on one monitoring site visit and a single falcon was seen on several other occasions." *Id.*

"Based on definitions of 'population' used in other experimental population rules . . . , [the FWS] believe[d] that a determination that a falcon population already exists in a designated area would require a minimum of two successfully-reproducing falcon pairs over multiple years." *Id.* The FWS concluded that "[b]iologically, the term 'population' is not normally applied to a single pair, and so the few birds in New Mexico could be considered emigrants disconnected from the Chihuahuan population." *Id.* Moreover, the FWS noted that "two, or even three, birds are not considered a self-sustaining population. Self-sustaining populations need a sufficient number of individuals to avoid inbreeding depression and occurrences of chance local extinction; this can range from 50 to 500 breeding individuals . . . ." *Id.*

10

Furthermore, not only did the FWS conclude that there was no current wild Falcon population, but it also found that repopulation was unlikely because "[n]atural, i.e., unaided, falcon recolonization of New Mexico and Arizona would be dependent on dispersing falcons" from other areas, including Mexico. *Id.* at 6824. "The half-century absence of falcons in Arizona and New Mexico suggests that the Chihuahua, Mexico, falcon population cannot recolonize New Mexico and Arizona with sufficient numbers to establish a population." *Id.* at 6825. In addition, the FWS found that "[t]he low fledgling success in Chihuahua, and stable or declining breeding numbers there . . . suggest that birds in this area are not likely to provide enough dispersers to populate New Mexico." *Id.* (citation omitted).

The FWS determined that the reintroduction of captive-bred Falcons as a nonessential experimental population would help to restore the Falcon. *Id.* at 6819. In particular, the FWS noted that The Peregrine Fund's captive-bred Falcons "were propagated with the intention of re-establishing a wild population within the United States to achieve recovery goals." *Id.* at 6821; *see also id.* at 6821–23 (outlining procedure for raising and releasing Falcons). The FWS also observed that this type of reintroduction "ha[d] been successful for other species, including the peregrine falcon . . . [and the] California condor." *Id.* at 6821. Moreover, the FWS successfully had reintroduced Falcons to two national

11

wildlife refuge areas in southern Texas under a safe harbor agreement[8] with The

Peregrine Fund.[9]  *Id.*  Based on this experience, the FWS "believe[d] that it is

possible to accelerate the establishment of a breeding population in the Southwest

through releases of captive-raised birds."[10]  *Id.* at 6822; *see also id.* at 6823 ("We

---

[8]      Safe harbor agreements are voluntary agreements between the FWS and private landowners, whereby the landowners agree to contribute to the recovery of a threatened or endangered species in exchange for assurances that the FWS will not require any other management activities by the landowners without their consent.  *See* FWS, Safe Harbor Agreements for Private Landowners, at 1 (Sept. 2009), *available at* http://www.fws.gov/endangered/esa-library/pdf/harborqa.pdf.

[9]      At the time of the proposed rule, The Peregrine Fund had forty-six pairs of breeding Falcons in its captive-breeding program.  Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona and Availability of Draft Environmental Assessment, 70 Fed. Reg. at 6821, 6822.  From that population, 1004 Falcons had been released in southern Texas.  *Id.* at 6821.  Of those Falcons, at least thirty-nine pairs had been established in southern Texas and the adjacent area in Mexico.  *Id.*  Those pairs had produced more than 179 young.  *Id.*  The FWS concluded that these releases had established a wild population of Falcons in that area.  *Id.* at 6822.  One hundred and twenty-five Falcons had also been released on private ranches in western Texas, pursuant to a safe harbor agreement, and had successfully fledged young.  *Id.*

[10]      The FWS concluded that safe harbor agreements, which it relied upon in Texas, would not work well in this instance.  "Despite the relative success of the falcon releases in Texas, [the FWS] believe[d] the Safe Harbor Agreements used to release falcons in Texas [we]re not the best mechanism for establishing falcons in New Mexico and Arizona."  Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona and Availability of Draft Environmental Assessment, 70 Fed. Reg. at 6824.  Safe harbor agreements apply only to private lands; not only are public lands more predominant in New Mexico and Arizona, but the public lands in those states are more suited to the Falcon's behavioral ecology than private lands.  *Id.*  The FWS therefore proposed promulgation of the 10(j) rule, covering

(continued...)

12

fully expect that the proposed [nonessential experimental population] will result in the establishment of a self-sustaining, resident population, which will contribute to the recovery of the species.").

The geographic boundary of the proposed nonessential experimental population was to cover all of New Mexico and Arizona, even though Falcons would be released only within New Mexico. *Id.* at 6822. The FWS concluded that the proposed area was geographically separate from other Falcon populations, as required by section 10(j), because the "area is geographically isolated from existing falcon populations in Mexico and Texas by a sufficient distance to preclude significant contact between populations." *Id.* at 6823. Although "taking" an endangered species is normally prohibited by the ESA, the proposed rule would allow a person to "take"[11] a Falcon within the proposed area "provided that the take is unintentional and was not due to negligent conduct." *Id.* at 6824. The FWS predicted that takings would be rare because "the reintroduction is compatible with existing land use practices for the area." *Id.*

## C. Final 10(j) Rule

The FWS prepared a draft environmental assessment ("EA") and solicited

---

[10](...continued) both private and public lands, rather than relying on safe harbor agreements. Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42,301.

[11]     Under 16 U.S.C. § 1532(19), "taking" a Falcon means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" the Falcon.

13

public comment. *Id.* at 6819, 6825. After the public comment period, the FWS issued a final 10(j) rule on July 26, 2006, which finalized its plan to release captive-bred Falcons into southern New Mexico as a nonessential experimental population. Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42,298.

In the final rule, the FWS again concluded that there was no wild population of Falcons in New Mexico or Arizona. *Id.* The FWS indicated that "[f]ormal surveys and reliable sightings . . . show that a small number of falcons have occurred in New Mexico, with a small number of sightings occurring in every decade since the 1960s." *Id.* at 42,299. The FWS also noted that "[r]epeated follow-up by highly qualified, experienced falcon surveyors . . . revealed that none of [those] falcons appeared to be local residents or defending a territory." *Id.* The FWS concluded that the Falcon sightings in New Mexico and Arizona "may represent falcons dispersing from the population in Chihuahua that were opportunistically foraging in areas rich in prey due to vegetative growth from precipitation." *Id.*

The FWS emphasized that the nonessential experimental population would be wholly separate geographically from naturally occurring Falcon populations. *Id.* at 42,300. The FWS explained that

> [i]n the case of the falcon, (1) [t]his subspecies has been
> known to disperse up to 250 kilometers, (2) it would be
> virtually impossible to preclude naturally occurring individual

14

falcons from intermingling with the experimental population, and (3) there has been only one pair that has reproduced one time within the [nonessential experimental population] area. Designation of a 10(j) [nonessential experimental population] requires that the reintroduced animals be "wholly separate" from any existing population. We do not consider the pair of falcons that bred in 2002 in Luna County to constitute a population. Therefore, the exclusion of the counties surrounding the 2002 pair from the 10(j) designation is not necessary. We identify the experimental population as all falcons found within the [nonessential experimental population] area, including reintrod[uced falcons and any lone dispersers and their offspring. We believe this is the best manner by which to manage the falcon reintroduction program to achieve species recovery.

*Id.* Relying on regulatory definitions of "population," the FWS concluded that "lone dispersers do not constitute a population or even part of a population" because dispersers "are not in common spatial arrangement sufficient to interbreed with other members of a population." *Id.* (internal quotation marks omitted). Individual animals, the FWS emphasized, do not constitute a population. *Id.* Accordingly,

> [t]he single pair of New Mexico falcons that successfully reproduced only once in 2002 (after a 50-year absence) is neither self-sustaining, a group, nor in common spatial relationship with the group of approximately 25 to 35 breeding falcon pairs in Mexico. These Mexico falcons occur 160 kilometers (km) (100 miles (mi)) or more south of the United States border.

*Id.* Moreover, the FWS noted that "the few birds sighted in New Mexico could be considered dispersers from the Chihuahuan population." *Id.* at 42,300–01. Because the FWS asserted that it "ha[s] no authority to manage a population in a

15

different country," it concluded that "the existence of a group in Mexico should not preclude conservation and management of falcons in the United States in order to achieve species recovery." *Id.* at 42,301.

Accordingly, the FWS planned to release captive-bred Falcons into New Mexico every year during the spring or summer and to evaluate the progress of the program every five years. *Id.* at 42,298, 42,301, 42,302, 42,309, 42,311. The Peregrine Fund was to conduct annual surveys of the surrounding areas to locate and record the surviving birds. *Id.* at 42,307–08. At the time of the promulgation of the 10(j) rule, the FWS "anticipate[d] releasing falcons for 10 years or more." *Id.* at 42,310. The FWS stated that "[e]fforts under th[e] 10(j) rule will cease when or if it is determined that the program no longer furthers the conservation of the falcon." *Id.* The FWS intended "the 10(j) rule to remain in place until the status of the species improves to a point where listing is no longer necessary, and the falcon can . . . be delisted." *Id.* at 42,311.

The Peregrine Fund began releasing captive-bred Falcons into New Mexico in 2006. As of July 2007, a grant agreement between the FWS and The Peregrine Fund reflected that The Peregrine Fund had received $295,793 to implement this program. As we noted in a related appeal, The Peregrine Fund "has released some 100 birds altogether, of which at least 50 have successfully reached independence in the wild and some have begun to reproduce." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 (10th Cir. 2009). In

16

this appeal, The Peregrine Fund claims that it released eleven Falcons in 2006, thirty-nine Falcons in 2007, and seventy Falcons in 2008.

## D. The Instant Litigation

On March 27, 2006, Forest Guardians filed an action in the District of New Mexico to compel the FWS to answer its 2002 petition requesting the designation of critical habitat for the Falcon in Arizona, New Mexico, and Texas.[12] Forest Guardians also challenged the 10(j) rule, alleging that the FWS had violated the APA because the rule did not comply with the ESA or NEPA.[13] Specifically, Forest Guardians alleged that the FWS had violated provisions of section 10(j) of the ESA that: (1) require that an experimental population be released only "outside the current range of such species"; and (2) state that an experimental population remains experimental only as long as it is "wholly separate

---

[12] Forest Guardians was joined by Chihuahuan Desert Conservation Alliance, Public Employees for Environmental Responsibility, New Mexico Audubon Council, Sierra Club, and Southwest Environmental Center in filing this action against the FWS. Because they are not parties to this appeal, we refer only to Forest Guardians.

Even though this action was originally filed in the form of a complaint, the parties later agreed to proceed as if it properly had been filed as a petition for review of agency action. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir. 1994). On October 22, 2007, Forest Guardians filed an opening brief on the merits of its petition for review, arguing that it was entitled to judgment on all of its claims.

[13] Although the action originally only encompassed a challenge to the FWS's failure to respond to the critical habitat petition, Forest Guardians amended its original complaint after the 10(j) rule was finalized to include the instant challenges to the rule.

geographically from nonexperimental populations of the same species." Forest Guardians predicated these ESA arguments on the assertion that "[t]he current range of the Northern Aplomado Falcon . . . includes Southern New Mexico and Northern Chihuahua, Mexico." R., Doc. 12, at 33 ¶ 83, 34 ¶ 86 (Am. Compl., filed Sept. 11, 2006). Forest Guardians also alleged that the FWS had violated NEPA because it had predetermined the outcome of its environmental analysis.

The district court granted the petition for agency review as to the designation of critical habitat in Texas and ordered the FWS to answer within thirty days. That ruling is not before us on appeal. The court also denied the petition as to all of Forest Guardians' other claims, upholding the 10(j) rule under the ESA and finding that the FWS had not predetermined the outcome of its NEPA analysis.[14] This appeal timely followed.

## II. DISCUSSION

On appeal, Forest Guardians argues that: (1) the FWS violated section 10(j) of the ESA by releasing an experimental population of captive-bred Falcons inside the current range of the species and not wholly separate geographically from populations of wild Falcons, and (2) the FWS violated NEPA by conducting

---

[14] Because the district court upheld the 10(j) rule, it denied as moot Forest Guardians' petition for review as to the claims involving the designation of critical habitat in New Mexico and Arizona. The parties correctly conceded that those states cannot be designated simultaneously as a nonessential experimental population area and as critical habitat for the Falcon. *See* 16 U.S.C. § 1539(j)(2)(C)(ii).

18

a biased analysis that did not constitute a "hard look" at the environmental impact of the proposed 10(j) rule, but rather was intended to reach a predetermined outcome. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we disagree with Forest Guardians and affirm the district court's denial of the petition for review of agency action.

## A. The 10(j) Rule and the ESA

We turn first to the validity of the 10(j) rule establishing a nonessential experimental population of captive-bred Falcons in New Mexico and Arizona. Forest Guardians argues that the rule violates section 10(j) of the ESA because it authorizes the release of captive-bred Falcons within the current range of the species and in an area that is not wholly separate geographically from a cross-border Falcon population. *See* 16 U.S.C. § 1539(j)(1), (2)(A). Forest Guardians contends that "[t]he reappearance of wild Falcons in New Mexico establishe[s] that the State is within the Falcon's 'current range'" because there is "a wild Falcon population span[ning] the border between New Mexico and Mexico." Aplt. Opening Br. at 7. It maintains that the record contains "abundant evidence" of Falcon sightings in New Mexico to support the existence of a cross-border population. *Id.* at 4; *see also id.* at 8. Forest Guardians argues that the FWS's position to the contrary "is simply wrong," *id.* at 40, because "there is no substantial evidence in the Record supporting [the] FWS's position that a cross-border Falcon population does not exist," *id.* at 13. Consequently, Forest

19

Guardians claims that the FWS "did not make a reasoned choice among fairly conflicting views." *Id.* at 32. Forest Guardians also alleges that the FWS issued the 10(j) rule to avoid ruling on its critical habitat petition.

The FWS responds that its conclusions were based "on the results of extensive surveys by expert biologists using [FWS]-approved survey protocols designed to maximize detection of Falcons." Aplee. Br. at 16. Moreover, "[t]he record reflects that the [FWS] endeavored to repeatedly follow-up on every credible Falcon sighting to ascertain whether any Falcons were resident and/or defending a territory." *Id.* The FWS argues that "[t]he record contains *extensive* evidence supporting [its] conclusion that despite occasional sightings of lone Falcons in the [nonessential experimental population] area and an isolated breeding occurrence by one pair of Falcons in 2002, an interbreeding, self-sustaining population did not exist in New Mexico, as part of a continuous swath or otherwise." *Id.* at 23. The FWS also contends that Forest Guardians' position is "predicated upon a statutory interpretation squarely rejected by this Court in *Wyoming Farm Bureau*." *Id.* at 22 (citing *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231). The FWS concludes by arguing that it has used political boundaries in the past to designate experimental areas, as in *Wyoming Farm Bureau Federation*, and that the use of political boundaries does not violate the ESA.

The Peregrine Fund agrees that the evidence in the record "overwhelming[ly]" supports the FWS's action. TPF Br. at 6. The Peregrine

Fund adds that the success of the Falcon's recovery "is far more likely. . . . with the infusion of a concentrated number of captive produced birds." *Id.* at 2. Furthermore, The Peregrine Fund maintains that "[p]olitical borders <u>do</u> have relevance in considerations involving the management and conservation of wildlife species, for the obvious reason that laws, rules, and practices regarding such matters often differ greatly on the two sides of an international border." *Id.* at 15.

### 1. Standard of Review

"We afford the district court's decision no particular deference, but rather, review the rules and administrative record independently." *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231. "Our review of the rules and record is governed by the [APA], 5 U.S.C. § 706. Essentially, we must determine whether the [agency]: (1) acted within the scope of [its] authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion." *Id.* (citing *Olenhouse*, 42 F.3d at 1574). "Review under the arbitrary and capricious standard is narrow in scope, but is still a 'probing, in-depth review.'" *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1221 (10th Cir. 2009) (quoting *Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1229 (10th Cir. 2005)). An agency's action is entitled to a presumption of validity, and the petitioner challenging that action bears the burden of establishing that the action is arbitrary or capricious. *Citizens' Comm. to Save Our Canyons v.*

21

*Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).

"Within this context, we will set aside the [agency's] factual determinations only if they are unsupported by substantial evidence." *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231. "Evidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Olenhouse*, 42 F.3d at 1575 (internal quotation marks omitted). "'The substantial-evidence standard does not allow a court to displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231 (quoting *Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999)). We will review matters of law de novo and will defer to the agency's construction of the ESA if Congress has not clearly spoken on the issue before us and has delegated authority over the subject at issue to the agency, unless the agency's "construction is unreasonable or impermissible." *Id.*; *accord Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 845 (1984).

### 2. Overview of the ESA and Section 10(j)

"Congress enacted the [ESA] in 1973 to 'provide for the conservation, protection, restoration, and propagation of species of fish, wildlife, and plants facing extinction.'" *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231 (emphasis omitted) (quoting S. Rep. No. 93-307, at 1 (1973), *reprinted in* 1982

22

U.S.C.C.A.N. 2989). "Toward that end, the [ESA] authorizes the Secretary of the Interior to list domestic or foreign species as endangered or threatened." *Id.* Once a species or subspecies is listed as endangered, it receives certain protections under the ESA, including a prohibition against trading or "taking" the species. 16 U.S.C. § 1538(a)(1); *see also id.* § 1532(16) (defining "species" to include subspecies). "The Secretary [must] develop and implement [recovery] plans . . . for the conservation and survival of endangered species . . . , unless he finds that such a plan will not promote the conservation of the species." *Id.* § 1533(f)(1). In addition, federal agencies "assume special obligations to conserve, recover and protect that species." *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231. Agencies are required to use their authority to "carry[] out programs for the conservation of endangered species" and to ensure that their actions are "not likely to jeopardize . . . any endangered species . . . or result in the destruction or adverse modification of [its critical] habitat." 16 U.S.C. § 1536(a)(1), (2).

Congress amended the ESA in 1982 to broaden the FWS's discretion to reintroduce endangered and threatened species into their historic ranges. *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231–32. In particular, Congress added section 10(j) to authorize the FWS to designate certain reintroduced populations of endangered and threatened species as "experimental populations." *See id.*; *see also* 16 U.S.C. § 1539(j). An "experimental population" is "any population . . . authorized by the Secretary for release . . . but only when, and at such times as,

23

the population is wholly separate geographically from nonexperimental populations of the same species." 16 U.S.C. § 1539(j)(1). "The Secretary may authorize the release . . . of any population . . . of an endangered species . . . outside the current range of such species if the Secretary determines that such release will further the conservation of such species." *Id.* § 1539(j)(2)(A). "Before authorizing the release of any population . . . the Secretary shall . . . identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species . . . ." *Id.* § 1539(j)(2)(B). As this court explained in *Wyoming Farm Bureau Federation*:

> Congress added section 10(j) to the Endangered Species Act in 1982 to address the Fish and Wildlife Service's and other affected agencies' frustration over political opposition to reintroduction efforts perceived to conflict with human activity. Although the Secretary already had authority to conserve a species by introducing it in areas outside its current range, Congress hoped the provisions of section 10(j) would mitigate industry's fears experimental populations would halt development projects, and, with the clarification of the legal responsibilities incumbent with the experimental populations, actually encourage private parties to host such populations on their lands.

199 F.3d at 1231–32 (citing 16 U.S.C. § 1539(j); H.R. Rep. No. 97-567, at 8 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2808, 2817). Designation of a population as "experimental" also allows the Secretary "flexibility and discretion in managing the reintroduction of endangered species." *Id.* at 1233.

24

Forest Guardians brought this challenge because, in its view, the 10(j) rule "dramatically weakened ESA protection, including habitat protection, for wild Falcons in New Mexico." Aplt. Opening Br. at 7. In short, Forest Guardians is concerned because the 10(j) rule allows the Falcon to be treated on public land as threatened rather than endangered, permits incidental takings of the Falcon (although not intentional takings, i.e., hunting), reduces consultation requirements for federal agencies concerning the Falcon, and prohibits the designation of critical habitat for the Falcon in New Mexico and Arizona. *See* 16 U.S.C. §§ 1536(a), 1539(j)(2)(C); 50 C.F.R. § 17.83(a)(2).

### 3. Forest Guardians' ESA Challenge

Forest Guardians challenges the FWS's application of its definition of "population" to the facts of this case and, relatedly, suggests that FWS has misconstrued our decision in *Wyoming Farm Bureau Federation*. Although the parties appear to agree on the number of Falcons that have been observed in New Mexico, they dispute the conclusion to be drawn from those observations. The resolution of this ESA challenge depends on whether the Falcons sighted in New Mexico constitute a cross-border population of wild Falcons such that the establishment of a nonessential experimental population in that area is not "outside the current range" of the species and is not "wholly separate geographically" from the cross-border population. *See* 16 U.S.C. § 1539(j)(1), (2).

25

We first examine the ESA to determine the appropriate method of applying section 10(j). As we noted in *Wyoming Farm Bureau Federation*, the ESA does not define the term "population," nor does it specify the meaning of the phrases relevant to this appeal—that is, "current range" or "wholly separate geographically from nonexperimental populations"; that is so because the conservation of a species requires flexibility and specialized management tailored to the circumstances of that particular species. 199 F.3d at 1233–34. "We therefore defer to the [FWS]'s interpretation of the phrase 'wholly separate geographically from nonexperimental populations,' so long as its interpretation does not conflict with the plain language of the Endangered Species Act." *Id.* at 1234.

The FWS generally defines a "population" as a self-sustaining "group of fish or wildlife . . . in common spatial arrangement that interbreed when mature." 50 C.F.R. § 17.3; *see also Wyo. Farm Bureau Fed'n*, 199 F.3d at 1234 & n.3; Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. 42,300. The FWS also has defined "experimental population" as

> an introduced and/or designated population (including any off-spring arising solely therefrom) that has been so designated in accordance with the procedures of this subpart but only when, and at such times as the population is wholly separate geographically from nonexperimental populations of the same species. Where part of an experimental population overlaps with natural populations of the same species on a particular

occasion, but is wholly separate at other times, specimens of the experimental population will not be recognized as such while in the area of overlap. That is, experimental status will only be recognized outside the areas of overlap. Thus, such a population shall be treated as experimental only when the times of geographic separation are reasonably predictable; e.g., fixed migration patterns, natural or man-made barriers. A population is not treated as experimental if total separation will occur solely as a result of random and unpredictable events.

50 C.F.R. § 17.80(a).

The FWS's conclusion under those definitions, that there is no wild population of Falcons in New Mexico or Arizona, is explained in detail in the 10(j) rule. In brief, the FWS determined that the nonessential experimental population would be "wholly separate geographically" from the wild Falcons. Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42,300. The FWS concluded that the 2001 pair of nesting Falcons in Luna County, New Mexico, which bred in 2002, did not constitute a population because a single pair is "neither self-sustaining, a group, nor in common spatial relationship" to the Falcons in Mexico. *Id.* The FWS reasoned that the Falcons in Mexico occurred at least 160 kilometers (or 100 miles) south of the border, so that population was not in "common spatial relationship" with the pair of New Mexico Falcons. *Id.* The FWS also determined that the sightings of "lone dispersers" that did not appear to be resident birds or birds defending a territory did not constitute a

27

population or even part of a population since they are not in "common spatial arrangement" sufficient to interbreed with other members of a population. *Id.* at 42,300–01. "Furthermore, two, or even three, birds are not considered a self-sustaining population. Self-sustaining populations require a sufficient number of individuals to avoid inbreeding depression and occurrences of chance local extinction." *Id.* at 43,201. Accordingly, the FWS declined to exclude the area in New Mexico from the 10(j) designation because that area had no existing population of wild Falcons. *Id.* Moreover, the FWS concluded that because it did not have the authority to manage the Mexican Falcon population, the existence of those Falcons "should not preclude conservation and management of [non-essential experimental] falcons in the United States in order to achieve species recovery." *Id.*

In deciding this case, we may draw guidance from our decision in *Wyoming Farm Bureau Federation*, which involved an analogous 10(j) rule. In that case, we upheld a rule establishing a nonessential experimental population of gray wolves in Yellowstone National Park and central Idaho. *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1229, 1241. In so holding, we concluded that the Department of the Interior's interpretation of the phrase "wholly separate geographically from nonexperimental populations" did not conflict with the ESA's plain language. *Id.* at 1234. The Department had defined "population" as "a potentially self-sustaining group in common spatial arrangement, and thus determined a

28

geographic separation is any area outside the area in which a particular *population* sustains itself." *Id.* (internal quotation marks omitted).

Although the Department "d[id] not dispute individual wolves may leave (and, from time to time, ha[d] left) Canada and Montana and enter the experimental population areas," *id.* at 1233, we held that such a possibility did not violate section 10(j)'s requirement that experimental populations be wholly separate from nonexperimental populations, *id.* at 1235–36. We instead concluded that the Department's determination that a population is more than one dispersing individual was a reasonable interpretation of the ESA. *Id.* at 1234–36. Under the definition of "population," "lone dispersers d[id] not constitute a population or even part of a population [because] they [we]re not in 'common spatial arrangement' sufficient to interbreed with other members of a population." *Id.* at 1234, *see also id.* at 1235–36. We also upheld the Department's interpretation of the phrase "current range" to mean the current range of a population and not of an individual wolf. *Id.* at 1236. In addition, we approved the Department's designation of the experimental area to include all wolves found within the area, reasoning that

> [b]ased on the facts (1) there were no reproducing wolf pairs and no pack activity within the designated experimental areas, (2) wolves can and do roam for hundreds of miles, and (3) it would be virtually impossible to preclude naturally occurring individual gray wolves from intermingling with the experimental population, the Secretary intentionally identified the experimental population as all wolves found within the

29

experimental areas, including imported wolves and any lone dispersers and their offspring. The Department determined it could best manage the wolf reintroduction program to achieve species recovery in this manner. We find nothing in the Act that invalidates this approach by requiring the protection of individuals to the exclusion or detriment of overall species recovery, or otherwise limiting the Department's flexibility and discretion to define and manage an experimental population pursuant to section 10(j).

*Id.* at 1236–37 (citations omitted).

In this case, the FWS closely followed the definitions upheld in *Wyoming Farm Bureau Federation*. Accordingly, we conclude that the FWS's definition of what constitutes a population for purposes of the 10(j) rule is not in conflict with the plain language of the ESA and is a reasonable interpretation of that language. Forest Guardians acknowledges the precedential effect of *Wyoming Farm Bureau Federation*. However, Forest Guardians reasons that *Wyoming Farm Bureau Federation* does not offer definitive answers to the issues that it advances here—whether there is substantial evidence in the record to support the FWS's conclusions that: (1) one breeding pair and the individual Falcons seen in New Mexico themselves do not constitute a population; (2) the dispersing Falcons in New Mexico were too distant from the Mexican population to form part of that population; and (3) the international border was a barrier that prevented a finding that there was such a population.

After carefully reviewing the record, we conclude that substantial evidence supports the FWS's first two conclusions. And we therefore need not reach the

FWS's third conclusion. In particular, we note that the record contains several biologists' surveys that monitored the status of the Falcon in New Mexico and Mexico.[15] Many of those surveys support the FWS's conclusions that the limited number of Falcons in New Mexico were likely long-range lone dispersers from the Mexican Falcons located 160 km (or 100 mi) south and that the Mexican

_____

[15] In reviewing the evidence, we reject Forest Guardians' contention that we should discount evidence obtained by the FWS or The Peregrine Fund. Forest Guardians relies on *Exxon Shipping Co. v. Baker*, __ U.S. __, 128 S. Ct. 2605, 2626 & n.17 (2008), to argue that we must give greater weight to the research of independent scientists rather than the research of scientists employed by the FWS or The Peregrine Fund. Forest Guardians urges that we should view evidence proffered by the FWS and The Peregrine Fund with "a substantial degree of skepticism" because it is "self-serving," Aplt. Opening Br. at 40 n.29, and "there is absolutely nothing here other than [The Peregrine Fund] and its affiliates singing the company song," Aplt. Reply Br. at 8.

However, *Baker* is distinguishable from the case at hand. In *Baker*, the Supreme Court stated that it was "aware of no scholarly work" on the propriety of the award of punitive damages for the Exxon Valdez incident under maritime law. 128 S. Ct. at 2626. The Court went on to note that it was aware of some literature "examining the predictability of punitive awards by conducting numerous 'mock juries,'" but "[b]ecause this research was funded in part by Exxon, [it] decline[d] to rely on it." *Id.* at 2626 n.17. By contrast, this case involves scientific studies and opinions by environmental groups *and* governmental agencies and is a far cry from Exxon's commercial support of research funded to aid Exxon in arguing against an adverse large punitive damage award. *See* Adam Liptak, *From One Footnote, a Debate Over the Tangles of Law, Science and Money*, N.Y. Times, Nov. 24, 2008, at A16, *available at* http://www.nytimes.com/2008/11/25/washington/25bar.html?_r=1. Furthermore, "agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1173 n.12 (10th Cir. 1999) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

31

Falcons were not likely to recolonize the southwestern United States.[16]

Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42,299–301, 42,307.  For example, after conducting a survey of the Falcons in Mexico in 1986, a biologist

---

[16]     The FWS and The Peregrine Fund analogize the lone Falcon dispersers to the individual wolves in *Wyoming Farm Bureau Federation* that dispersed over long distances and occasionally entered the nonessential experimental population area.  The FWS argues that "the fact that *dispersers* can enter and have entered the [nonessential experimental population] area plainly does not indicate that a naturally occurring population of Falcons *sustains* itself in this area."  Aplee. Br. at 41.  In promulgating the rule at issue, the FWS explained that

> [e]ven though falcons from Mexico may enter New Mexico occasionally, the 10th Circuit Court in the wolf case (Wyoming Farm Bureau Federation v. Babbitt) supported the use of the 10(j) designation under very similar circumstances of occasional, low frequency contact.  In over 50 years, we know of only one pair of successfully reproducing falcons in New Mexico.  This one occurrence does not indicate that there is self-sustaining, regular interbreeding occurring between falcons in New Mexico and those in Mexico.  The single pair of falcons that successfully reproduced once in 2002, after a 50-year absence, is not self-sustaining, not a group, and not in common spatial relationship with the group of approximately 25 to 35 breeding falcon pairs in the Mexican State of Chihuahua, 160 km (100 mi) south of the United States border.  These Mexican birds appear to be self-sustaining and interbreeding, even though the population is not expanding.  In addition, there is a significant gap between the location of the pair in the United States and the most northern breeding pair in Chihuahua, and even more distance to the main cluster of breeding pairs there.

Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42,307.

concluded that there were not a large number of Falcons in Chihuahua or other areas of Mexico adjacent to the United States. He also noted that grasslands in that area, which constitute the Falcons' potential habitat, were limited and scattered. Based on these observations, he tentatively concluded that "[p]ortions of Mexico adjacent to the United States probably do not support enough Aplomado Falcons to foster natural recolonization of the United States." FWS Supp. App. at 166.

The record indicates that other experts have agreed with that conclusion. Although the record does contain reports describing occasional sightings of apparently non-resident Falcons either alone or hunting in pairs, many surveys have repeatedly found no Falcons. At the time the FWS promulgated the 10(j) rule, the breeding pair in Luna, New Mexico, was the only recorded nesting pair of Falcons in New Mexico since 1952. Thus, the record contains substantial evidence to support the FWS's conclusions that the Falcons seen in New Mexico do not constitute a population themselves and that those dispersers were too geographically removed from the Mexican Falcons to form part of that interbreeding, self-sustaining population.

Although the record also contains evidence to support Forest Guardians' argument, we are not free to displace the FWS's choice between two fairly conflicting views. *See Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231 (quoting *Trimmer*, 174 F.3d at 1102). In commenting upon the appropriateness of the 10(j)

33

rule, an expert even acknowledged that the question of whether there was a population of wild Falcons in New Mexico was "equivocal[] and cogent arguments can be made for either position."  J.A. at 83; *see also id.* at 87 (stating that the definition of what constitutes a population "could go on endlessly").  Forest Guardians does not point to any evidence in the record indicating that the FWS failed to acknowledge the existence of any other Falcons in New Mexico or Arizona.

Forest Guardians instead relies on the *conclusion* drawn from scholarly articles and by individual biologists that are contrary to the *conclusion* drawn by the FWS.  In particular, Forest Guardians argues that two scholarly articles should be given the most weight of any evidence in the record under *Baker*.  Aplt. Opening Br. at 8–13 (citing J.A. at 362–66 (Raymond A. Meyer & Sartor O. Williams, III, *Recent nesting and current status of Aplomado Falcon (Falco Femoralis) in New Mexico*, 59 N. Am. Birds 352–56 (2005)); J.A. at 367–77 (Kendal E. Young et al., *Aplomado Falcon Abundance and Distribution in the Northern Chihuahuan Desert of Mexico*, 38 J. Raptor Res. 107–17 (2004))).  Those articles conclude that the Falcons sighted in New Mexico are part of a cross-border population with the Falcons in Mexico.  The FWS and The Peregrine Fund criticize these articles for neither defining a "population" nor explaining the basis for the authors' conclusions.  Moreover, we reject Forest Guardians' argument that some evidence should be given greater weight than other evidence

34

in the record. *See supra* note 15. Although this conflict among the experts indicates that biologists disagree as to the conclusion that may be drawn from the facts, nothing in the record indicates that the FWS's conclusion contrary to that advocated by Forest Guardians was arbitrary or capricious.

In sum, the FWS did not act arbitrarily or capriciously in promulgating the 10(j) rule under the ESA. The FWS's definition of what constitutes a population is not in conflict with the plain language of the ESA and is a reasonable interpretation of that language. We also conclude that substantial evidence in the record supports the FWS's conclusion that no wild population of Falcons in New Mexico would prevent the release of captive-bred Falcons into that area as part of a nonessential experimental population. Thus, because we determine that the rule was promulgated in accordance with the ESA and that the FWS's actions did not violate the APA, we next turn to the second issue on appeal—whether the FWS complied with NEPA in promulgating the 10(j) rule.

## B. The 10(j) Rule and NEPA

Forest Guardians also contends that the FWS violated NEPA in promulgating the 10(j) rule. In particular, Forest Guardians argues that the FWS failed to take the requisite hard look at the environmental impacts of its proposed actions because it predetermined the outcome of its environmental analysis. Forest Guardians alleges that The Peregrine Fund refused to allow the FWS to use its captive-bred Falcons unless the FWS agreed to promulgate a 10(j) rule. The

35

remedy sought by Forest Guardians is similar to that awarded in *Metcalf v. Daley*, 214 F.3d 1135, 1145–46 (9th Cir. 2000), that is, a direction to the district court to order the agency to set aside the Finding of No Significant Impact ("FONSI") and begin the NEPA process anew.

The FWS responds that the record "wholly fail[s] to demonstrate predetermination." Aplee. Br. at 46. The agency contends that NEPA does not "require agency personnel to be subjectively impartial" and that the proper focus should be on the adequacy of its EA analysis. Aplee. Br. at 44, 46. In fact, the FWS maintains that Forest Guardians has not alleged that the substance of the EA was flawed or incomplete and has not challenged the issuance of the FONSI. The Peregrine Fund adds that Forest Guardians "muddles the distinction between a 'predetermined NEPA analysis' and acceptance of the Agency's preferred action alternative." TPF Br. at 20. The Peregrine Fund argues that "agencies and other third parties were *uniformly* supportive of the preferred alternative," which was the 10(j) rule. *Id.* at 21. It also argues that there is no evidence in the record that the FWS failed to consider other action alternatives; rather, the evidence shows that the FWS took a hard look over six years before adopting the preferred action alternative.

### 1. Standard of Review

We review NEPA claims under the APA independently, giving "no particular deference to the district court's review of an agency action." *See Colo.*

*Envtl. Coal.*, 185 F.3d at 1167 n.5.  "As with other challenges arising under the APA, we review an agency's NEPA compliance to see whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *New Mexico ex rel. Richardson*, 565 F.3d at 704 (quoting 5 U.S.C. § 706(2)(A)). In the context of a NEPA challenge, "[a]n agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made a 'clear error of judgment.'" *Id.* (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)); *accord Colo. Envtl. Coal.*, 185 F.3d at 1167; *see also Metcalf*, 214 F.3d at 1143–45 (using arbitrary and capricious standard in reviewing predetermination claim); *cf. Davis v. Mineta*, 302 F.3d 1104, 1111, 1112–13 (10th Cir. 2002) (applying the arbitrary and capricious standard in preliminary injunction context involving claim of NEPA predetermination).  "When called upon to review factual determinations made by an agency as part of its NEPA process, short of a 'clear error of judgment' we ask only whether the agency took a 'hard look' at information relevant to the decision." *New Mexico ex rel. Richardson*, 565 F.3d at 704; *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983).  Finally, "[a] presumption of validity

37

attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1176 (internal quotation marks omitted).

## 2. Overview of NEPA

"The centerpiece of environmental regulation in the United States, NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives." *New Mexico ex rel. Richardson*, 565 F.3d at 703; *see also* 42 U.S.C. §§ 4331, 4332. "NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co.*, 462 U.S. at 97 (citation omitted) (internal quotation marks omitted); *see also New Mexico ex rel. Richardson*, 565 F.3d at 703 ("By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions.").

Under NEPA, "[b]efore an agency may take 'major Federal actions significantly affecting the quality of the human environment,' an agency must prepare an environmental impact statement ('EIS') in which the agency considers

38

the environmental impacts of the proposed action and evaluate[s] 'alternatives to the proposed action,' including the option of taking 'no action.'" *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(d)). In doing so, the agency must take a "hard look" at information relevant to its decision. *New Mexico ex rel. Richardson*, 565 F.3d at 704; *see also Balt. Gas & Elec. Co.,* 462 U.S. at 97; *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (per curiam) ("NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." (internal quotation marks omitted)). "When it is unclear whether a proposed action requires an EIS, the agency may first prepare a less detailed [EA]." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (citing 40 C.F.R. § 1501.4(b)). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a [FONSI] and forego the further step of preparing an EIS." *Id.* (citing 40 C.F.R. § 1501.4(e)).

In this case, the FWS prepared an EA followed by a FONSI. In 2003, the FWS began its NEPA analysis by requesting public comment and holding public meetings in Arizona and New Mexico as part of the scoping process. In 2005, the FWS initiated a second public comment period on the proposed 10(j) rule and the draft EA and held two public hearings in New Mexico. In the EA, the FWS

39

considered five alternatives:  (1) the no-action alternative, (2) the *preferred and chosen alternative* of reintroducing Falcons in New Mexico and designating the species as a 10(j) nonessential experimental population in all of New Mexico and Arizona, (3) reintroducing Falcons in New Mexico and designating the species as a 10(j) nonessential experimental population in parts of New Mexico and all of Arizona, (4) reintroducing Falcons in New Mexico by entering into safe harbor agreements with private landowners but without designating the species as a 10(j) nonessential experimental population, and (5) reintroducing Falcons in New Mexico without designating the species as a 10(j) nonessential experimental population or entering into safe harbor agreements.  The FWS issued a final EA in June 2006 and a FONSI in July 2006.

### 3.  Forest Guardians' NEPA Challenge

Forest Guardians challenges the entire NEPA analysis as suspect because the FWS allegedly did not take a hard look at the environmental impacts of its proposed actions due to its alleged bias.  We disagree.

NEPA does not require agency officials to be "subjectively impartial." *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 470 F.2d 289, 295 (8th Cir. 1972).  An agency can have a preferred alternative in mind when it conducts a NEPA analysis.  40 C.F.R. § 1502.14(e); *see also Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1185 (9th Cir. 1997) (noting that "an agency can formulate a proposal or even identify a preferred

40

course of action before completing an EIS"). "The test of compliance . . . then, is one of good faith objectivity rather than subjective impartiality." *Envtl. Def. Fund, Inc.*, 470 F.2d at 296. However, "the comprehensive 'hard look' mandated by Congress and required by [NEPA] must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf*, 214 F.3d at 1142; *accord Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1257–58 (D. Wyo. 2004); *see also* 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, *rather than justifying decisions already made*." (emphasis added)); 40 C.F.R. § 1502.5 ("The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and *will not be used to rationalize or justify decisions already made*." (emphasis added)).

We have previously addressed similar predetermination claims. *E.g.*, *Silverton Snowmobile Club*, 433 F.3d at 780–81; *Lee v. U.S. Air Force*, 354 F.3d 1229, 1240 (10th Cir. 2004); *Davis,* 302 F.3d at 1112–13; *cf. Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1186 (10th Cir. 2002) ("find[ing] no . . . preordained result" under *Davis* in a case involving illegal delegation of preparation of an EIS to a state agency and its contractor). We find *Davis*'s discussion regarding the predetermination of a NEPA analysis to be

instructive, even though *Davis* arose from a different procedural posture. *See* 302

F.3d at 1109–11 (reviewing the denial of a motion for a preliminary injunction).

In *Davis*, the plaintiffs sought to enjoin the defendants from proceeding

with a highway-construction project on the grounds that the defendants had

violated NEPA and the Department of Transportation Act by preparing an

inadequate EA and issuing a FONSI rather than an EIS. *Id.* at 1109. We

concluded that the plaintiffs were likely to prevail on the merits of their claim

that the agency had acted arbitrarily and capriciously; not only were procedural

and substantive deficiencies identifiable in the environmental analysis itself, but

the record also established that the defendants had "prejudged the NEPA issues."

*Id.* at 1112. The contractor hired by the agency to prepare a draft EA for the

agency's approval "was contractually *obligated* to prepare a FONSI and to have it

approved, signed and distributed by [the agency] by a date certain. The decision

whether to prepare a FONSI should have been based on the EA, of course, not the

other way around." *Id.* We found that the contractor's predetermination was

attributable to the agency because the agency "was involved throughout the NEPA

process" and had indicated in a meeting that it was aware that a FONSI had been

prepared prior to the public's opportunity to comment on the EA. *Id.* at 1112–13

(internal quotation marks omitted). The agency also was aware of many of the

inadequacies of the EA and the FONSI but failed to fix the problems. *Id.* at 1113.

We held that the predetermination resulted in an environmental analysis that was

tainted with bias and then enumerated the inadequacies found in the analysis. *Id.*

at 1112–13, 1118–26. The plaintiffs ultimately received the requested

preliminary injunction. *Id.* at 1126. Thus, *Davis* indicates that if an agency

predetermines the NEPA analysis by committing itself to an outcome, the agency

likely has failed to take a hard look at the environmental consequences of its

actions due to its bias in favor of that outcome and, therefore, has acted arbitrarily

and capriciously.[17]

In *Silverton Snowmobile Club*, we rejected the plaintiffs' argument that the

agencies had violated NEPA by reaching a predetermined result. 433 F.3d at

780–81. The plaintiffs alleged that the agencies had "structured" their NEPA

analysis and issues to ensure that the ultimate outcome would be inevitable. *Id.* at

780 (internal quotation marks omitted). After examining the record, we

concluded that, far from conducting a biased NEPA analysis, the agencies had

reached a compromise solution between competing user groups. *Id.* at 781. In

---

[17]    We take this opportunity to clarify the meaning of our statement in *Davis* that prejudgment (i.e., predetermination) "diminishes the deference owed to the federal defendants in our review of their decision to issue a FONSI rather than an EIS." 302 F.3d at 1112. We caution that *Davis*'s reference to "deference" should not be taken to mean that the arbitrary and capricious standard in the APA does not apply to this type of claim. To the contrary, our discussion of the standard of review in *Davis* quite clearly indicates that we review an agency's NEPA analysis and its potential bias "under the APA's deferential 'arbitrary and capricious' standard." *Id.* at 1111 (quoting 5 U.S.C. § 706(2)(A)). What *Davis* meant was that, if an agency predetermines the result of its NEPA analysis, this court is more likely to conclude that the agency failed to take a hard look at the environmental consequences of its actions and, therefore, acted arbitrarily and capriciously.

43

reaching that conclusion, we distinguished *Silverton Snowmobile Club* from the Ninth Circuit's decision in *Metcalf*, where the federal agency had entered into a binding agreement to reach a certain outcome before conducting a NEPA analysis. *Id.* at 781 n.2 (discussing *Metcalf*, 214 F.3d at 1144). *Silverton Snowmobile Club* concluded that *Metcalf* was "a very different situation from this case, where the agencies had no preexisting agreement with any user group." *Id.*

In light of *Davis* and its progeny, it is clear that an agency may violate NEPA, and consequently the APA, when it predetermines the result of its environmental analysis. As the Ninth Circuit explained in *Metcalf*, "[i]t is highly likely that because of the Federal Defendants' prior written commitment . . . , the EA was slanted in favor of finding that the . . . proposal would not significantly affect the environment." 214 F.3d at 1144; *see also Int'l Snowmobile Mfrs. Ass'n*, 340 F. Supp. 2d at 1261 ("Given these definite statements . . . , it does not seem that the [agency] could have issued any other rule . . . . [T]he issuance of the FEIS, ROD and Final Rule were nothing more than *pro forma* compliance with the requirements of NEPA.").

A petitioner must meet a high standard to prove predetermination. We now make explicit what was implicit in our previous decisions: predetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental

44

analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action. *See, e.g.*, *Silverton Snowmobile Club*, 433 F.3d at 781 n.2 (detecting no predetermination because agency "had no preexisting agreement with any user group"); *Lee*, 354 F.3d at 1240 (concluding that no predetermination occurred, even though the U.S. Air Force had entered into a series of agreements with the German Defense Ministry, because those agreements either were not executed until after the completion of the NEPA requirements or would not take effect until after the completion of those requirements); *Davis*, 302 F.3d at 1112–13 (holding that predetermination had occurred, when the consultant preparing the EA was contractually obligated to reach a certain environmental analytic outcome, with the endorsement of the agency).

Thus, predetermination is different in kind from mere "subjective impartiality," *Envtl. Def. Fund, Inc.*, 470 F.2d at 296—which does not undermine an agency's ability to engage in the requisite hard look at environmental consequences—*even though* subjective impartiality may under certain circumstances involve something resembling predetermination and lead an agency down the road to predetermination. This difference is highlighted by the stringent standard that must be met in order for us to conclude that an agency violated NEPA by predetermining the outcome of its environmental analysis—a conclusion that we would not and should not reach lightly. In order for us to

conclude that an agency has engaged in predetermination, we must decide that the agency has *irreversibly and irretrievably* committed itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis. We would not hold, therefore, that predetermination was present simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the *possibility* that a particular environmental outcome would be the result of its NEPA review of environmental effects. *See Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 892–93 (9th Cir. 2002) ("[W]e read the . . . memorandum to indicate that the Forest Service contemplated waiving the road density standard . . . . However, such contemplation does not amount to a NEPA violation unless the . . . memorandum committed the Forest Service to the amendments proposed. It did not." (citations omitted)); *cf. Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 230 (D.D.C. 2003) (holding that plaintiffs would likely succeed on their predetermination claim; noting that "[t]his is not a case in which the agency merely contemplated the issuance of depredation permits prior to embarking on an EA which ultimately recommended such a course of action").

We observe that this clarification of our standard of proof for establishing predetermination puts us on a similar path as the Ninth Circuit,[18] which would

---

[18] To avoid any possible confusion, we note that our substantial alignment with the Ninth Circuit is the product of our clarification of the import

(continued...)

46

hold that predetermination has occurred only when an agency has made "*an irreversible and irretrievable commitment* of resources" based upon a particular environmental outcome, prior to completing its requisite environmental analysis. *See Metcalf,* 214 F.3d at 1143 (emphasis added). By way of illustration, in *Metcalf,* federal agencies had "(1) prepare[d] an EA, (2) decide[d] that the . . . proposal would not significantly affect the environment, and (3) issue[d] a FONSI, but . . . [only] *after* already having signed two agreements binding them to support the . . . proposal." *Id.* at 1142 (emphasis added). The Ninth Circuit in *Metcalf* held that the agencies had violated NEPA by making an "irreversible and irretrievable commitment of resources" prior to completing the environmental review. *Id.* at 1145; *see also, e.g.*, *id.* at 1144 ("By the time the Federal Defendants completed the final EA . . . , the die already had been cast. The 'point of commitment' to this proposal had come and gone."); *accord Save the Yaak Comm. v. Block,* 840 F.2d 714, 717–19 (9th Cir. 1988) (holding that such an irreversible and irretrievable commitment was present when construction

---

[18](...continued)
of *our* own case law. We do not adopt here the Ninth Circuit's standard, as articulated in *Metcalf.* For example, *Metcalf* speaks in terms of commitment of "resources" and subsequent Ninth Circuit authority has suggested that an arguably narrow construction of that term is appropriate. *See WildWest Inst. v. Bull*, 547 F.3d 1162, 1168 (9th Cir. 2008) (discussing *Metcalf* and noting that "[o]ur cases have focused on the commitment of *natural resources*, not necessarily the agency's financial resources"). However, because we are applying our own precedent, and not adopting the Ninth Circuit's standard, we are not to any extent bound by the Ninth Circuit's interpretation of its standard, including the interpretative analysis in *WildWest Institute*.

contracts were awarded *prior to* the completion of the EAs, and construction of the road had begun by the time of the preparation of the biological assessment); *Fund for Animals*, 281 F. Supp. 2d 229–30 (concluding that the plaintiffs demonstrated a likelihood that they would succeed in proving that the agency had failed to take a hard look under NEPA when, *prior* to completing the EA, the agency had issued fourteen permits authorizing the killing of mute swans).

We also must identify the proper focus of the predetermination inquiry. Specifically, we must determine what evidence this court will examine in evaluating a predetermination claim. To support its claim of predetermination, Forest Guardians relies on evidence outside of the NEPA analysis itself to prove the FWS's alleged bias. This evidence includes intra-agency comments on the draft rule, agendas and minutes from meetings between the FWS and The Peregrine Fund, e-mail correspondence within the FWS and between the FWS and The Peregrine Fund, and the grant agreement between the FWS and The Peregrine Fund. In other words, Forest Guardians' argument does not oblige us, as in *Davis*, to scrutinize the agency's NEPA analysis for signs of bias.

Although the FWS rejects the idea that Forest Guardians' evidence shows predetermination, it more fundamentally contends that Forest Guardians cannot properly rely on evidence beyond the environmental analysis itself. In advancing this argument, the FWS would have us follow the Fourth Circuit's approach in *National Audubon Society v. Department of the Navy*, 422 F.3d 174, 198–99 (4th

48

Cir. 2005). In that case, the court declined to look at internal Navy e-mails and other documents "to advance the theory that the Navy had irreversibly decided [on its course of action] before it began its environmental impact analysis." *Id.* at 198. The Fourth Circuit instead stated that a reviewing court "should generally restrict its inquiry to the objective adequacy of the EIS . . . [and] should not conduct far-flung investigations into the subjective intent of an agency." *Id.* The court explained that

> [t]his rule is supported by common sense. Inquiries into subjective intent in the NEPA context open a Pandora's box that courts should in most cases attempt to avoid. Psychoanalyzing an agency's intent could restrict the open exchange of information within an agency, inhibit frank deliberations, and reduce the incentive to memorialize ideas in written form. It could also frustrate an agency's ability to change its mind or refocus its actions, the very effect that NEPA was designed to encourage. *See* 40 C.F.R. § 1502.1 ("primary purpose" of an EIS "is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government"). Finally, most federal agencies consist of numerous actors with varying levels of responsibility and different objectives; discerning one subjective intent is a speculative exercise at best.

*Id.* at 198–99 (second alteration in original). The court reasoned that "[w]here an agency has merely engaged in post hoc rationalization, there will be evidence of this in its failure to comprehensively investigate the environmental impact of its actions and acknowledge their consequences." *Id.* at 199.

We respectfully decline, however, to follow the Fourth Circuit's approach

49

for several reasons. First, it is contrary to our precedent. In judging whether an agency has impermissibly committed itself to a course of action before embarking upon a NEPA analysis, we have previously looked to evidence outside of the environmental analysis itself. Recall that, in *Davis*, this court attributed the predetermination of private parties (who had contractually agreed to the issuance of a FONSI and who had been hired by the federal agency to prepare the EA) to the federal agency itself. 302 F.3d at 1112–13. In doing so, the *Davis* court examined the minutes of a meeting and a memorandum and concluded that the FONSI had been prepared prior to what was apparently nothing more than a *pro forma* public opportunity to comment on the EA. *Id.* In *Lee*, this court similarly analyzed the contents of several agreements between the U.S. Air Force and the German Defense Ministry.[19] 354 F.3d at 1240.

Second, we conclude that the Fourth Circuit's restrictive approach does not permit the predetermination inquiry to be conducted with sufficient analytic rigor.

---

[19]     Furthermore, we note that other courts have examined similar evidence, including e-mails, letters, memoranda, meeting minutes, and statements made at a press conference—as well as the agency's issuance of permits and entrance into binding contracts—to determine if an agency predetermined the outcome or otherwise acted in bad faith in conducting the NEPA analysis. *See, e.g., WildWest Inst.*, 547 F.3d at 1168–69; *Native Ecosys. Council*, 304 F.3d at 892–93; *Coal. Against a Raised Expressway, Inc. v. Dole*, 835 F.2d 803, 807–08 (11th Cir. 1988); *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of the U.S. Army*, 492 F.2d 1123, 1129 (5th Cir. 1974); *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1125–26 (D. Nev. 2008); *Colo. Wild, Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1230 (D. Colo. 2007); *Int'l Snowmobile Mfrs. Ass'n*, 340 F. Supp. 2d at 1260–61; *Fund for Animals*, 281 F. Supp. 2d at 229–30.

Specifically, we doubt the wisdom and efficacy of an approach that would limit the focus of the predetermination inquiry to the environmental analysis alone. That approach could fail to detect predetermination in cases where the agency has irreversibly and irretrievably committed itself to a course of action, but where the bias is not obvious from the face of the environmental analysis itself. We cannot be confident that, in every instance, the bias will be evident from the NEPA analysis. For example, even though the EA and FONSI in *Metcalf* were not facially flawed, "[i]t [was] highly likely that because of the Federal Defendants' prior written commitment . . . and concrete efforts . . . , the EA was slanted in favor of finding that the . . . proposal would not significantly affect the environment." 214 F.3d at 1144. The purpose behind NEPA is to ensure that the agency will only reach a decision on a proposed action after carefully considering the environmental impacts of several alternative courses of action and after taking public comment into account. Accordingly, irrespective of the facial regularity of the agency's NEPA analysis, we should not ignore relevant evidence that suggests that the agency may have violated the procedures established by NEPA, thereby contravening the statute's overarching purpose.

We also need not be concerned that extending our review of relevant evidence beyond the NEPA analysis would have the detrimental effects alluded to by the Fourth Circuit on agency decisionmaking or the principled adjudication of predetermination claims. That is because the evidence must meet the rigorous

51

standard of establishing that the agency has made "an irreversible and irretrievable commitment." *Id.* at 1143 (internal quotation marks omitted). Thus, agency employees need not be afraid to conduct debates over e-mail because the agency will not be found to have conducted a biased NEPA analysis unless those communications fairly could be said to have the effect of binding the agency (as a whole) to an irreversible and irretrievable commitment to a course of conduct based upon a particular environmental outcome, thereby rendering any subsequent environmental analysis biased and flawed. Furthermore, because of the rigorous nature of the predetermination standard, not all voices will be accorded equal significance. The relevant voices must be those who would be situated by virtue of their positions to effectuate an irreversible and irretrievable commitment of the agency regarding the matter at hand. Accordingly, the stray comments of a low-level scientist or two—no matter how vigorously expressed—would be unlikely to render fatally infirm the otherwise unbiased environmental analysis of an entire agency. Therefore, we respectfully conclude that the Fourth Circuit's concerns about the detrimental effects on agency deliberations and the principled adjudication of predetermination claims are not well-founded because the content of the communications would have to amount to an irreversible and irretrievable commitment of agency resources. In sum, we respectfully decline to follow the Fourth Circuit's approach, as explicated in *National Audubon Society*.

After reviewing the relevant record evidence in this case, we conclude that

there is no indication that the FWS made such an irreversible and irretrievable commitment to the release of captive-bred Falcons as a 10(j) nonessential experimental population. At most, the evidence demonstrates that the FWS had a preferred alternative and that The Peregrine Fund shared that preference. The record also reveals some internal disagreement among the FWS biologists on the advisability and propriety of the 10(j) rule. We do not dispute that some of the comments, particularly those in e-mails authored by one biologist, were intemperate.[20] But the bottom line is that the evidence before us simply does not

---

[20] The biologist wrote in a string of e-mails that the 10(j) rule was "a done deal," that the rule was proposed merely to placate The Peregrine Fund, and that, because the FWS would lose a court challenge to the rule, "[i]n the long run, [the head of The Peregrine Fund] probably needs to think about a Kentucky Fried Falcon chain" because "there won't be much else he can do with the captive bred birds." J.A. at 62. But no matter how inflammatory, an individual's comments remain immaterial to the predetermination analysis unless they (1) may fairly be attributed to the agency, and (2) tend to reflect the agency's irreversible and irretrievable commitment to a course of action—in contemplation of a particular environmental outcome—even *before* the requisite environmental analysis has been completed. No tenable arguments could be advanced here to this effect based upon the comments at issue.

For that same reason, we cannot find that an e-mail authored by a biologist working for The Peregrine Fund, stating that the FWS "promised" the 10(j) outcome, is enough to bind the FWS or prove that the FWS had in fact made an irreversible and irretrievable commitment. There is no comparable evidence in the record like that in *International Snowmobile Manufacturers Ass'n*, for example, where the Assistant Secretary for Fish and Wildlife and Parks had declared at a press conference that the agency was firmly committed to a course of action (banning snowmobiles in Yellowstone National Park) before completing its NEPA analysis. 340 F. Supp. 2d at 1259–61. In that case, the court concluded that "it does not seem that the [agency] could have issued any other rule." *Id.* at 1261.

rise to the level required for this court to conclude that the FWS engaged in predetermination.

We specifically conclude that the grant agreement is not evidence of predetermination. If Forest Guardians had been able to prove that the FWS and The Peregrine Fund had entered into a binding contract firmly committing the FWS to the 10(j) outcome before its NEPA analysis, we would be faced with a similar set of circumstances to those in *Metcalf* and very likely would have reached a different conclusion than we do here. However, we do not agree with Forest Guardians' argument that the grant agreement is such a contract. The grant agreement, which the two parties entered into before the NEPA analysis was completed, provides that the grant could be expanded upon the promulgation of the 10(j) rule. If the rule were not promulgated, then the work by The Peregrine Fund would be limited to activities such as research, captive breeding, and "[c]ontact[ing] landowners in New Mexico with regard to the potential establishment of an experimental nonessential 10(j) population." J.A. at 462.

Forest Guardians contends that the provision allowing The Peregrine Fund to contact New Mexico landowners should be interpreted to mean that the grant "began funding work on a[n] experimental non-essential 10(j) population." Aplt. Opening Br. at 53. We do not share that interpretation. That provision does not indicate that there was only one predetermined outcome. If the proposed rule was not promulgated, a nonessential experimental population would still be possible

54

for the future and so landowner contact in New Mexico could later prove useful. Thus, because the record contains no evidence that the FWS failed to take a hard look at the environmental impacts of the 10(j) rule due to bias, we conclude that the FWS did not act arbitrarily and capriciously in conducting its NEPA analysis.

### III. CONCLUSION

For the foregoing reasons, we reject Forest Guardians' challenge to the FWS's 10(j) rule, concluding that the FWS complied with the ESA, the APA, and NEPA in promulgating the rule. We therefore **AFFIRM** the district court's denial of Forest Guardians' petition for review of agency action.

08-2226, *Forest Guardians v. U.S. Fish & Wildlife Service and the Peregrine Fund*

**GORSUCH, J.**, concurring.

I am pleased to concur in the court's opinion. I write to note only two minor points.

First, under § 706 of the APA, an agency's NEPA analysis of course may not be arbitrary or capricious. As the majority notes, this court has previously held that one way an agency can fail § 706's test is if the agency "predecides" the outcome of a NEPA analysis irreversibly and irretrievably. *See* Maj. Op. at 44. In assessing Forest Guardians' predetermination claim today, the court looks beyond the four corners of the Fish and Wildlife Service's environmental assessment ("EA") document to other evidence in the administrative record. In doing so, however, the court does not endorse the practice of looking outside the administrative record itself, at least absent "extremely limited circumstances," such as where a party first makes a predicate "'strong showing of bad faith or improper behavior.'" *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)) (other internal quotation marks omitted).

Second, one of our sister circuits seems to have suggested that our review in cases like this one should be restricted further still, to the EA itself, and not

take account even of other materials in the administrative record. *See Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 198-99 (4th Cir. 2005). The majority suggests that we have previously rejected this approach in *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002), and *Lee v. U.S. Air Force*, 354 F.3d 1229 (10th Cir. 2004). *See* Maj. Op. at 49-50. As it happens, though, *Davis* and *Lee* did not analyze or resolve the question; in both cases, the parties and this court simply proceeded on the premise that no legal impediment stood in the way of examining the full administrative record when deciding a predetermination claim. In these circumstances, the legal question posed by *National Audubon* remains an open one in this circuit. *See United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *cf. Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed the applicability of the *Chapman* standard on habeas, we are free to address the issue on the merits."). Neither is the resolution of the question essential to our decision today. This is because, as the majority amply explains, Forest Guardians' claim in this case fails *regardless* whether we restrict our analysis to the objective adequacy of the Fish and Wildlife Service's EA (as the Service and *National Audubon* would have it) or consider other administrative record materials beyond the EA itself (as Forest

Guardians prefers).  *See* Maj. Op. at 52-54.